**EASTERN EXPRESS, INC. et al.,**

v.

**UNITED STATES of America et al.**

No. TH 59–C–50.

United States District Court
S. D. Indiana,
Terre Haute Division.

Sept. 5, 1961.

David E. Rosenfeld, Rosenfeld & Wolfe, Thomas J. Hogan, Terre Haute, Ind., Bryce Rea, Jr., Watkins & Rea, Roland Rice and Homer S. Carpenter, Rice, Carpenter & Carraway, Washington, D. C., for plaintiffs.

Robert W. Ginnane, Gen. Counsel, B. Franklin Taylor, Jr., Associate Gen. Counsel, Interstate Commerce Commission, Washington, D. C., Robert A. Bicks, Acting Asst. Atty. Gen., Don A. Tabbert, U. S. Atty., Indianapolis, Ind., for defendants.

Kenneth F. Burgess, D. Robert Thomas, Chicago, Ill., Frank M. McHale, McHale, Cook, Welch & McKinney, William E. Jenner, Jenner & Brown, Indianapolis, Ind., Harry C. Ames, James L. Givan, Washington, D. C., S. S. Eisen, George H. Leonard, New York City, Theodore R. Schneider, St. Louis, Mo., for intervening defendants.

Before CASTLE, Circuit Judge, and STECKLER and HOLDER, District Judges.

PER CURIAM.

This is an action to set aside and annul an order of the Interstate Commerce Commission approving certain freight forwarder volume commodity rates in connection with trailer-on-flatcar service.[1] The action was brought pursuant to 28 U.S.C. §§ 1336, 1398 and 2321 through 2325. The United States of America was made a party as required by Section 2322. The court's jurisdiction of the parties and the subject matter is not in issue. A three-judge court was convened pursuant to 28 U.S.C. § 2284, and the case was submitted upon the pleadings and a certified copy of the record of the proceedings before the Interstate Commerce Commission, including the evidence therein. Exhaustive briefs were filed, and the court has had the benefit of oral arguments of counsel.

For brevity, hereinafter the Interstate Commerce Commission will be referred to as "the Commission."

Plaintiffs were protestants before the Commission. Plaintiff Eastern Motor Express, Inc. is an Indiana corporation with its principal office in Terre Haute,

---

[1]. The initial report and order of the Commission is dated September 4, 1959, and was entered in Investigation and Suspension Docket 6993, which includes Supplemental Orders Nos. 1–7, Forwarders Volume Commodity Rates Between Chicago and New York, 308 I.C.C. 455; and its report on reconsideration is dated April 8, 1960, in Docket No. 32530, Forwarder Volume Commodity Rates Between Chicago and New York, 310 I.C.C. 199.

Indiana. It is a common carrier by motor of general commodities in interstate and foreign commerce from New York City, New York, and other eastern cities to Chicago, Illinois, and St. Louis, Missouri, serving all intermediate points on most of its routes. Plaintiff The Eastern Central Motor Carriers Association, Inc. is an Ohio corporation, the membership of which is comprised of common carriers by motor which provide transportation of property in interstate commerce between eastern points, including Chicago and St. Louis. Plaintiff The National Motor Freight Traffic Association, Incorporated is a membership corporation of the District of Columbia, its members being common carriers by motor which are in competition for traffic with the freight forwarders whose operations and rates are the subject of the report and order of the Commission in this proceeding. Plaintiff The Regular Common Carrier Conference of the American Trucking Association, Inc. is a District of Columbia corporation, the membership of which comprises common carriers by motor which perform transportation in interstate or foreign commerce over regular routes under the jurisdiction of the Commission.

By order of this court, the freight forwarders whose rates were approved by the Commission in the order which the plaintiffs seek to annul and the Freight Forwarders Institute, an association of freight forwarders, were permitted to intervene as defendants in this proceeding. The defendant freight forwarders are: A. B. C. Freight Forwarding Corporation; Acme Fast Freight, Inc.; Blue Ribbon Express, Inc.; Clipper Carloading Company, Inc.; International Forwarding Company, Inc.; Sidney B. Lifschultz, Bernice Brown, Rose Grossman, Nora Bergman and American National Bank and Trust Co. of Chicago, Trustee, a partnership, d/b/a Lifschultz Fast Freight; Midland Forwarding Corporation; National Carloading Corporation; Pacific and Atlantic Shippers, Inc.; Republic Carloading & Distributing Company, Inc.; Springmeier Shipping Company, Inc.; and Universal Carloading & Distributing Company, Inc. Each defendant freight forwarder is engaged in the transportation, or the providing of transportation, of property in interstate commerce subject to regulation by the Commission.

The four principal common carrier transportation agencies, namely the railroads, motor carriers, water carriers, and freight forwarders, are regulated in separate parts of the Interstate Commerce Act. The freight forwarders are regulated under Part IV of the act, which was adopted in 1942 (49 U.S.C.A. § 1001 et seq.) "Freight forwarder" is defined in Section 402(a) of the Act, as amended, 49 U.S.C.A. § 1002(a), which reads:

"(5) The term 'freight forwarder' means any person which (otherwise than as a carrier subject to chapters 1, 8, or 12 of this title) holds itself out to the general public as a common carrier to transport or provide transportation of property, or any class or classes of property, for compensation, in interstate commerce, and which, in the ordinary and usual course of its undertaking, (A) assembles and consolidates or provides for assembling and consolidating shipments of such property, and performs or provides for the performance of break-bulk and distributing operations with respect to such consolidated shipments, and (B) assumes responsibility for the transportation of such property from point of receipt to point of destination, and (C) utilizes, for the whole or any part of the transportation of such shipments, the services of a carrier or carriers subject to chapters 1, 8, or 12 of this title."

In July, 1958, the railroads inaugurated a trailer-on-flatcar ("piggyback") service which requires the shipper to furnish the trailers and to transport them to and from the rail loading ramps. These rates, known as Plan III, to distinguish them from other types of "pig-

gyback" service offered,[2] provide for the transportation of not more than two trailers on one flatcar, the trailers to be empty or loaded with not more than 70,000 pounds of freight, no one commodity to exceed sixty per cent of the total carload weight.

By tariff schedules filed with the Commission to become effective on August 20, 1958, and later dates, the defendant freight forwarders published a number of volume rates for the transportation of specified commodities between Chicago and the New York City area in shipments of the respective minimum weights specified in the tariffs, ranging from 10,000 to 30,000 pounds. The proposed rates were published on the same level as the corresponding rates for similar shipments between Chicago and New York maintained by the principal motor common carriers. Under the proposed rates, a shipper desiring to ship between Chicago and New York by freight forwarder a shipment of one of the specified commodities at the weight of 10,000 to 30,000 pounds specified in the tariff item would be enabled to do so at the same rate as that available to him by motor carrier, such rate being lower per hundred pounds than the rate for smaller shipments.

Upon protest of the plaintiff motor carrier associations, plaintiff Eastern Express, Inc., and certain other motor common carriers operating within official territory,[3] the proposed forwarder rates reviewed by the Commission in its Investigation and Suspension Docket No. 6993, and supplements, were suspended until March 20, 1959, and later dates, when they became effective. Similar volume commodity rates of defendant International Forwarding Company, Inc. between Chicago and New York were not suspended and became effective prior to September 19, 1958, but were included in the Commission's investigation by order of the Commission on September 19, 1958, in Docket No. 32530.

Hearings were held before an examiner of the Commission, at which testimony and exhibits were received in evidence. An examiner's report was waived by the parties, briefs were submitted, and oral argument was heard by the entire Commission. On September 4, 1959, the Commission made and filed its report containing its findings and conclusions and entered its order,[4] in which report and order the Commission, among other things, made the ultimate finding that the rates in question are just and reasonable and not otherwise unlawful, and discontinued the proceedings. After the plaintiffs filed their complaint in this court, the Commission, on its own motion, reopened the proceedings for reconsideration on the record, and this court stayed the present action pending final administrative action on the reopening. On April 8, 1960, the Commission made and filed its report on reconsidera-

2. Under Plan I TOFC service, the railroads provide motor carriers, in substitution for highway movement, flatcar transportation of their freight-laden trailers. The traffic moving in this service moves on motor carrier billing and at motor carrier published rates.

Plan II TOFC service is offered by the railroads directly to the shipping public and consists of transportation from the shipper's premises to the receiver's premises in highway trailers provided by the railroads, the movement between the railroads' terminals being accomplished on railroad flatcars.

Plan III TOFC service is offered directly to the shipping public but is restricted to the movement on railroad flatcars of traffic in shipper-provided trailers. It differs from Plan II in that the railroads provide neither the trailers nor their movement beyond their terminals.

Plan IV TOFC service is the same as Plan III service except that the shipper provides both the trailers and the flatcars.

3. Official territory consists generally of that part of the United States lying east of the Mississippi River and north of the Ohio River and a line drawn roughly from Cincinnati, Ohio, to Norfolk, Virginia; hence it includes the territory between Chicago and New York involved here. See ·New York v. United States, 1947, 331 U.S. 284, 291, 67 S.Ct. 1207, 91 L.Ed. 1492; Class Rate Investigation, 1939, 262 I.C.C. 447, 457, 516 (1945).

4. Footnote 1, supra.

tion [5] in which it made certain additional findings, adhered to the views which it had expressed in the prior report, and affirmed the findings therein.

■■ Plaintiffs state there is not before the court an issue involving administrative expertise; that the issues before the court are those which are familiar to judges—a question of statutory construction, and whether the administrative agency failed to perform the statutory obligation placed upon it by the statute. On the other hand, the defendants state that the general issue before the court is simply whether the Commission's conclusion that the rates at issue are just and reasonable, and not otherwise unlawful, is supported by adequate findings and is in accordance with statutory standards. In support, they say the rates in question are peculiarly for the decision of the Commission as the expert in the field; that the Commission, as the rate making body, is charged with determining the justness and reasonableness of rates and tariffs for interstate shipments under the Act, and if the conclusion of the Commission is in accordance with law, is not arbitrary, or an abuse of discretion, and is supported by adequate findings which reveal that the decision has a rational basis, and not against the public interest, then the decision may not be disturbed on review. We agree this is a general statement of the rule. As we understand our function, we are not permitted to prescribe or approve rates, nor are we at liberty to prescribe general attitudes the Commission must adopt towards the exercise of its discretion left to it rather than to the courts. We are to decide only whether the Commission has acted within the power delegated to it by law. I. C. C. v. Inland Waterways Corp., 1942, 319 U.S. 671, 691, 63 S.Ct. 1296, 87 L.Ed. 1655.

Though there are many subsidiary aspects of plaintiffs' argument, they fall generally under three principal headings. Plaintiffs contend the rates in issue are unlawful for the following reasons:

First, the assailed service the forwarders are enabled to render under the Commission's order is such that it goes far beyond the scope of lawful freight forwarder operation. They claim forwarder operations authorized by statute embrace only less-truckload or less-carload shipments, and that lawful forwarder operations require numerous services which will not be rendered in the course of the "new," "alien" forwarder activity.

Second, plaintiffs state the freight forwarder service made possible through their volume rates, and under Plan III of the rail carriers, will be in derogation of Section 418 of the Interstate Commerce Act, which prohibits forwarders from supplying "instrumentalities" of transportation, except as permitted in that section, 49 U.S.C.A. § 1018.[6]

And third, they say the Commission's order approving the volume commodity forwarder rates permits the entry of the forwarders into the field of truckload and volume transportation which will impair the abilities of the motor carriers to continue their services to the large and small points at equivalent rates without discrimination or prejudice, and that this would be destructive of the national transportation system by rail, highway, and water. Under this latter contention, plaintiffs also assert that the full reach of the Interstate Commerce

---

5. Footnote 1, supra.

6. Section 418 provides:
 "It shall be unlawful, except in the performance within terminal areas of transfer, collection, or delivery services, for freight forwarders to employ or utilize the instrumentalities or services of any carriers other than common carriers by railroad, motor vehicle, or water, subject to this Act; express companies subject to this Act; air carriers subject to the Civil Aeronautics Act of 1938, as amended; common carriers by motor vehicle engaged in transportation exempted under the provisions of section 203(b) (7a) of this Act; common carriers by motor vehicle exempted under the provisions of section 204(a) (4a) of this Act; or common carriers by water engaged in transportation exempted under the provisions of section 303(b) of this Act."

Act requires that the separate modes of transportation be kept separate, and that the volume commodity shipments by the forwarders will deprive the public of inherent advantages of separate modes of transport.

Counsel for the United States, and counsel for the Commission, counter by stating that the freight forwarder service offered under the challenged rates is well within the statutory area of forwarder activity, in that the volume basis of the challenged rates is no bar to their legality, and the service rendered under the challenged rates is true forwarder activity; that the Commission did not err in concluding that Section 418 does not prohibit the freight forwarder from rendering the service contemplated by the rates at issue, since the purpose of Section 418 is simply to require freight forwarders to use specified regulated and exempt common carriers, rather than contract carriers, for the performance of line-haul transportation, and that since the line-haul transportation is performed by the railroads, there is no violation of Section 418. And finally, they state that the Commission gave due and proper consideration to the relevant provisions of the national transportation policy in concluding that the rates in issue are just and reasonable.

The argument of the defendant freight forwarders is similar to that of the United States and the Commission. They say the Commission properly found that the handling of forwarder shipments in the 10,000 to 30,000 pound minima weight category and the publication of rates thereon are lawful; that the Commission properly found that under these rates the forwarders would perform the services contemplated in the statutory definition of freight forwarders; that the Commission properly found that the assailed service does not violate Section 418; and that the Commission correctly found that the rates at issue are proper under the national transportation policy, and that to deny forwarders their right to compete fairly with the motor carriers would be contrary to that policy.

With these arguments before us, we have examined the reports of the Commission and the record of evidence in these proceedings.

The Commission's reports contain statements of findings and conclusions in support of its ultimate finding. The Commission found that in recent years the freight forwarders operating in official territory generally have maintained rates the same as those of the principal motor common carriers on shipments weighing less than 10,000 pounds; that, apart from the rates in question, the freight forwarders have published rates on some commodities subject to weights exceeding 10,000 pounds on a lower basis than those applicable on smaller shipments; that this has not been true generally, because the spread between the freight forwarder rates and the rail carload rates used by the forwarders for rail movement of consolidated forwarder shipments was insufficient to permit the establishment by the forwarders of lower rates on a profitable basis; that in July, 1958, some rail carriers established trailer-on-flatcar ("piggyback") rates between Chicago and the New York City area of $451.50 which require the shipper to furnish the trailers and to transport them to and from the rail loading and unloading ramps; that these rates under Plan III TOFC, provide for the transportation of not more than two trailers on one flatcar, empty, or loaded with not more than 70,000 pounds of freight, with no one article to exceed a specified percentage of the total weight of the shipment, usually 60 per cent, and that if the weight of the lading exceeds 70,000 pounds, the excess weight is subject to a rate of 64.5 cents per hundred pounds; that after these rail rates were established, the forwarders, concluding that they could establish lower rates on volume shipments on a profitable basis, published the volume rates at issue with the avowed purpose of meeting motor-carrier competition.

The Commission further found that the forwarders generally maintain lower rates on shipments weighing 5,000

pounds than on shipments of lesser weights, thereby giving effect to the lower cost for handling one large shipment as compared with several small shipments of the same aggregate weight, and that the plaintiffs do not object to this, although the plaintiffs urge that no weight break other than at 5,000 pounds should be permitted to the forwarders; the Commission also found and concluded that there is nothing in the provisions of Part IV of the Interstate Commerce Act, or the legislative history of those provisions which establishes that freight forwarders are, or were intended to be, limited in the weight of shipments which they may handle or which prohibits forwarders from establishing rates subject to minima ranging from 10,000 to 30,-000 pounds; that the Commission in earlier decisions had approved freight forwarder rates at various volume minimum weights in excess of 10,000 pounds; that it is just and reasonable that the shipping public should receive the benefits flowing from any ability of a forwarder to handle a heavier shipment more economically than it can handle several small shipments of the same aggregate weight; and that in the absence of an applicable statutory limitation or prohibition, there is no justification for holding that freight forwarders may not publish lower rates on heavier weighted shipments based upon economies inherent in the lower costs to them of the underlying transportation service which they utilize.

The Commission found that under the forwarder rates at issue the forwarders generally would pick up a shipment, either in a pick-up truck or in a trailer used in line-haul service, and bring it to their terminals, where it would be held awaiting consolidation with a sufficient quantity of other shipments so as to constitute the necessary trailer-loads, or would load into a line-haul trailer containing a shipment other freight picked up at a shipper's place of business en route between the forwarder's terminal and the railhead; that when two trailers were loaded they would be moved to the rail ramp and the rail carrier would place them on a flatcar; that occasionally one of the trailers may be loaded with only one shipment from one consignor to one consignee; that in order to comply with the provisions of the rail Plan III tariffs at least two different commodities must be loaded on each flatcar; that although there is no evidence that the forwarders have done so in the past, it is possible under the Plan III rail rates for a flatcar to be loaded with two trailers each containing but a single shipment; and that where a forwarder contracts for two or more shipments (including the case of two shipments each occupying a single trailer), tenders them at the railhead to be shipped as a single carload shipment, and makes, or arranges for, distribution of each of the tendered shipments to its consignee, there is consolidation and distribution by the forwarder despite the fact that the railroad which provides the underlying transportation physically places the trailers on the flatcar and removes them from the flatcar at the termination of the line haul. The Commission concluded that in the ordinary and usual course of their business, the forwarders will perform the services contemplated by Section 402(a) of the Interstate Commerce Act, 49 U.S.C.A. § 1002(a).

Rejecting the contention of the plaintiffs that Section 418 of the Interstate Commerce Act, 49 U.S.C.A. § 1018,[7] prohibits the forwarders from providing the trailers which the rail carriers hold themselves out to transport under the rail Plan III rates, the Commission found that under the railroads' Plan III rates utilized by the forwarders for the line-haul transportation, there is no holding out by the railroads to furnish the trailers, and the rail rates apply on empty as well as loaded trailers; that the trailers are to be regarded as containers or articles of commerce rather than as instrumentalities of transportation; that in their relation with rail carriers forwarders are in most respects shippers, and, like ordinary shippers, they may furnish

7. Footnote 6, supra.

trailers under the rail Plan III rates; and that the purpose of Section 418 is to prevent forwarders from utilizing contract carriers for line-haul transportation.

After reciting the pertinent provisions of the national transportation policy (49 U.S.C.A. preceding Sections 1, 301, 901 and 1001) and pointing out that this declaration of policy does not mean that one transportation agency may be required to refrain from establishing rates which are just and reasonable and otherwise lawful in order to protect the traffic of a competing mode, the Commission found that since the rates at issue are in no instance lower than the corresponding rates of the motor carrier protestants, any advantage which one agency of transportation may have over the other is the result of differences in service; that the evidence does not permit a finding that the forwarder rates under consideration will produce a diversion in traffic sufficient to imperil the abilities of the motor carriers to survive and serve the public; that the forwarder rates are compensatory and are no lower than necessary to meet the existing competition; and that to refuse to permit the forwarders to maintain rates on the same level as those of the motor carriers would be tantamount to an attempt by the Commission to apportion traffic artificially and thereby to prevent normal, healthy competition and deny forwarders an opportunity to compete fairly with motor carriers, contrary to the national transportation policy.

Plaintiffs' statements to this court on brief that the forwarders had not heretofore published rates applicable to volume shipments is contrary not only to the findings of the Commission but also to the evidence of both parties at the hearing before the Commission. Exhibit 20, offered by plaintiffs, consisted of fourteen pages setting forth existing volume rates of the defendant forwarders, prior to the rates here under consideration, which were applicable to shipments having minimum weights of 10,000 to 30,000 pounds between the points involved in this proceeding. The commodities covered by those pre-existing volume rates consisted of various kinds of freight, namely, bicycles NOI; bicycle parts, iron or steel; boots or shoes; floor coverings; freight, all kinds; pads or padding; traffic materials; radio receiving sets and television receiving sets, and related articles; electric razors; and soap ingredients. The tariff (Exhibit 4) filed with the Commission by one of the defendant forwarders in 1943, just after Part IV of the Interstate Commerce Act went into effect, published volume rates between Chicago and New York and other eastern points at progressively lower levels for higher minimum weights ranging up to a minimum weight of 20,-000 pounds. Those volume rates remained in effect until 1947 when they were cancelled because the forwarder's costs had gone up to such a point, due to rail increases, that the forwarder no longer could continue to publish those rates. Thereafter, that forwarder lost the majority of its volume business because the truck rates were lower than the forwarder rates. The evidence showed that the forwarder rates for transcontinental shipments have for many years included large numbers of volume rates, that the forwarder Tariff 8 series which applies westbound is entitled "Volume Commodity Rates," that both it and the forwarder eastbound transcontinental tariff contained many rates with minimum weights of 30,000 pounds or more, that thousands of volume rates for transcontinental application have been published by the forwarders, and that the forwarders for many years have been handling large numbers of shipments under their transcontinental volume rates at the relatively high minimum weights.

The evidence before the Commission showed that the national annual volume of freight handled by Class I motor carriers increased from 83,576,122 tons in 1948 to 132,730,481 tons in 1956, the latest date of record, whereas the volume handled by freight forwarders in 1948 was only 4,074,984 tons and in 1956 only 4,598,349 tons (Exhibit 12); that the

majority of the shipments, both of motor carriers and of freight forwarders, were substantially less than the 10,000 to 30,000 pound weights which are the minimum weights here involved, the average shipment handled in 1956 by motor carriers being 1,253 pounds and by freight forwarders being 361 pounds (Exhibit 7); that the annual average shipment handled by one defendant freight forwarder in the period 1943 through 1946, when the forwarder maintained the volume rates between New York and Chicago shown in Exhibit 4, ranged from 908 pounds to 1,142 pounds (Exhibit 6); and that despite the general parity of rates of motor carriers and freight forwarders for shipments weighing less than 10,000 pounds, the competition for shipments at equal rates has not prevented survival and growth of the motor carriers.

One additional matter should be mentioned. Plaintiffs complain that they presented to the Commission on the record, certain questions which the Commission did not discuss or dispose of in its first report. They allege that the Commission's failure to do so was error under Section 8(b) of the Administrative Procedure Act, 5 U.S.C.A. § 1007. Plaintiffs state that upon the re-opening of the proceeding, they again asked the Commission to rule specifically on those matters by filing a petition which restated them in twelve separate questions. They insist that five of the questions were not answered by the Commission either directly or by implication in either report.

In its second report dated April 8, 1960, the Commission gave attention to the petition wherein the questions were asked, and stated—"The contents of that petition have been given careful consideration, and to the extent that the questions propounded are important to the issues presented, the answers thereto will be found herein or in the prior report in these proceedings." Taking the reports together, we agree with the Commission that to the extent the questions propounded are important to the issues presented before the Commission, the answers are found in the two reports. The Commission made adequate subsidiary findings upon the material issues presented in the proceedings before it, and the ultimate findings which it was required to make are supported by substantial evidence. Minneapolis & St. Louis R. Co. v. United States, 1959, 361 U.S. 173, 192, 80 S.Ct. 229, 4 L.Ed.2d 223.

From the foregoing, we conclude as a matter of law, that the defendant freight forwarders are not restricted by the Interstate Commerce Act, including the national transportation policy, to the handling of so-called small shipments or to the handling of shipments weighing less than 10,000 pounds or any other particular weight; nor are they so restricted to the publication of rates at minimum weights less than the minimum weights specified in the forwarder tariffs here involved. Nothing in that act and policy requires that freight rates of freight forwarders to the shipping public for shipments of more than 10,000 pounds shall be higher than the freight rates of the competing motor carriers for such shipments, or that they shall be no lower per hundred pounds than freight forwarder rates for smaller shipments. Nothing in that Act and policy gives, or was intended to give, to the motor carriers a right to exclude freight forwarders from competition with motor carriers for shipments of 10,-000 pounds or more; nor does that Act and policy provide that competition of freight forwarders for such shipments shall be restrained by requiring freight forwarders to charge the public more for such shipments than is charged by motor carriers, or by requiring freight forwarders to charge for such shipments rates no lower per hundred pounds than the rates for smaller shipments. The legislative history of Part IV of the Interstate Commerce Act shows that Congress was well aware that freight forwarders handled shipments weighing in excess

of 10,000 pounds,[8] and further shows that Congress refused to restrict competition by adopting proposed provisions of Part IV [9] which, if adopted, would have made it unlawful for freight forwarders to publish rates lower than the contemporaneous rates of common carriers by railroad or motor vehicle for a like kind and quantity of property between the same points.

Under their operations described in the reports of the Commission in connection with the handling of shipments to which these freight forwarder rates apply, the freight forwarders, in the ordinary and usual course of their undertaking, would perform all of the services contemplated by Section 402(a) (5) of the Interstate Commerce Act.

 With respect to the plaintiffs' argument that the assailed forwarder service is in derogation of Section 418 of the Interstate Commerce Act, in view of the reasons stated in the Commission's initial report in these proceedings, which have been stated heretofore, we concur in the conclusion of the Commission that rail shipments by the freight forwarders of their trailers, loaded or empty, under the rail Plan III piggyback rates published by the railroads and available for the use of the shipping public, are not unlawful under said section.

 In reaching its conclusions in this matter, the Commission gave due and careful consideration to, and properly applied the provisions of, the national transportation policy, as well as the other provisions of the Interstate Commerce Act. The record before the Commission amply justifies its conclusion that "The evidence does not permit a finding that the forwarder rates under consideration will produce a diversion of traffic sufficient to imperil the abilities of the motor carriers to survive and serve

the public"; and the Commission's conclusion that "to refuse to permit the forwarders to maintain rates on the same level as those of the protestants would be tantamount to an attempt by us to apportion traffic artificially, and thereby to prevent normal, healthy competition and deny forwarders an opportunity to compete fairly with motor carriers, contrary to the national transportation policy" is a rational, proper and permissible judgment.

The decision of the Commission in this proceeding is consistent with its previous decisions. The Commission in previous decisions has approved the publication by freight forwarders of rates for volume shipments at various minimum weights over 10,000 pounds. Consolidation of Shipments by Freight Forwarders, 256 I.C.C. 305 (1943); New England Motor Rate Bureau, Inc. v. Julius Bleich, doing business as New York-Philadelphia Dispatch, 272 I.C.C. 133 (1948); Prepared Flour from Los Angeles to Arizona, 283 I.C.C. 92 (1951); Barge Service Corporation Freight Forwarder Application, 285 I.C.C. 249, 285 I.C.C. 309 (1953); Freight Forwarder Commodity-Rates Westbound Transcontinental, 296 I.C.C. 445 (1955); Acme Fast Freight, Inc. v. Western Freight Association, 299 I.C.C. 315 (1956); Iron and Steel from Monaca, Pa. to Southern Points, 305 I.C.C. 110 (1958); Forwarder Volume Commodity Rates, Transcontinental, 306 I.C.C. 535 (1959); Radios, Boots, Etc. from the East to Texas, 306 I.C.C. 615 (1959). Prior to the enactment in 1942 of Part IV of the Interstate Commerce Act, the Commission approved rail rates for the transportation of trailers of freight forwarders and other shippers and considered such trailers to be containers or articles of commerce. Vehicle Container Rates in Southwest, 196 I.C.C. 127

8. Hearings before a Subcommittee of the Senate Committee on Interstate and Foreign Commerce on S.Res. 146, 76th Cong., 3rd Sess., June, 1940, pp. 31, 175–176, 298, 302, 429.

9. Hearings before the House Committee on Interstate and Foreign Commerce on

H.R. 3684—A Bill to Amend the Interstate Commerce Act, as Amended, to Provide for the Regulation of Freight Forwarders, 77th Cong., 1st Sess., March, 1941, pp. 3–4.

(1933); Trucks on Flat Cars between Chicago and Twin Cities, 216 I.C.C. 435 (1936). In New England Motor Rate Bureau, Inc. v. Julius Bleich, doing business as New York-Philadelphia Dispatch, 272 I.C.C. 133 (1948), the Commission, over the objections of competing motor carriers, approved rates of a freight forwarder at minimum weights up to 30,000 pounds, under which the freight forwarder shipped its loaded trailers by rail to the point from which delivery of the shipment was made direct to the consignee. In Movement of Highway Trailers by Rail, 293 I.C.C. 93 (1954), the Commission approved the use by freight forwarders of rail rates for the transportation of loaded trailers of the freight forwarders. As stated by the Commission in its reports herein, the Commission has held that the national transportation policy "does not mean that one transportation agency may be required to refrain from establishing rates which are reasonable and otherwise lawful in order to protect the traffic of a competing mode. E. g., Cigarboxes from Newark, N. J. to Selma, Ala., 296 I.C.C. 68; Various Commodities,— Mid-Atlantic and New England, 63 M.C. C. 584; see Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282 [54 S.Ct. 692, 78 L.Ed. 1260]." The Commission also has previously held that in ruling upon competitive transportation rates, it should exercise extreme care to avoid an attempt "to apportion the traffic artificially and thereby eliminate normal, healthy competition contrary to the national transportation policy." Fabrics from Georgia and North Carolina to Okla. and Texas, 63 M.C.C. 430, 434 (1955). By its reports and order in this proceeding, the Commission has properly recognized the right of the defendant freight forwarders to make available to the shipping public reduced rates to meet motor carrier competition on volume shipments, such reduced rates having been made possible through the use by the forwarders of the economical Plan III rates and transportation service instituted by the rail carriers in 1958,

and the action of the Commission was in no way arbitrary or capricious.

The Commission's order of September 4, 1959 was issued after full and fair hearing, is within the scope of the statutory jurisdiction and authority of the Commission, is supported by adequate findings based upon substantial evidence, has a rational basis, and is in all respects in accordance with law.

The injunction prayed for by the plaintiffs should be denied and the complaint should be dismissed.

It is therefore hereby ordered that an appropriate final judgment in accordance herewith be entered.