**COOPER–JARRETT, INC., et al.,**
Plaintiffs,

v.

**The UNITED STATES of America, and
Interstate Commerce Commission,
et al., Defendants.**

**No. 13469–3.**

United States District Court
W. D. Missouri, W. D.

Feb. 6, 1964.

Swanson, Midgley, Jones, Blackmar & Eager, Kansas City, Mo., Watkins & Rea, Rice, Carpenter & Carraway, Washington, D. C., for plaintiffs.

Michael I. Miller, Dept. of Justice, with whom Asst. Atty. Gen., Lee Loevinger and Joel E. Hoffman, Dept. of Justice, Robert W. Ginnane, B. Franklin Taylor, Jr., Interstate Commerce Commission, Washington, D. C. and F. Russell Millin, Kansas City, Mo., were on the brief, for defendants.

Burchmore, Good & Bobinette, Chicago, Ill., Lathrop, Righter, Gordon & Parker, Kansas City, Mo., Frank S. Farrell, St. Paul, Minn., James A. Gillen, Chicago, Ill., Louis A. Harris, St. Paul, Minn., L. W. Hobbs, Omaha, Neb., Harvey Huston, Chicago, Ill., Roland J. Lehman, Chicago, Ill., Thormund A. Miller, Washington, D. C., Robert F. Munsell, Chicago, Ill., L. E. Torinus, Jr., St. Paul, Minn., Walter G. Treanor, San Francisco, Cal., Belnap, Spencer, Hardy & Freeman, Chicago, Ill., Sebree, Shook, Hardy & Ottman, Kansas City, Mo., A. C. Armstrong, Baltimore, Md., J. T. Clark, Cleveland, Ohio, J. A. Daily, New York City, K. A. Dobbins, Cleveland, Ohio, E. E. Hunt, New Haven, Conn., Paul R. Duke, Philadelphia, Pa., Sidley, Austin, Burgess & Smith, Chicago, Ill., Watson, Ess, Marshall & Enggas, Kansas City, Mo., Harry C. Ames, James L. Givan, Washington, D. C., S. S. Eisen, George H. Leonard, New York City, Theodore R. Schneider, St. Louis, Mo., I. Richman, New York City, Giles Morrow, Washington, D. C., for intervenors.

C. J. Munn, Jr., and William C. McLaughlin, Chicago, Ill., Morrison, Hecker, Cozad & Morrison, Kansas City, Mo., for Swift & Co.

Before RIDGE, Circuit Judge, GIBSON, Chief District Judge, and DUNCAN, District Judge.

DUNCAN, District Judge.

This action was brought by the plaintiffs under §§ 1336, 1398, 2284 and 2321 through 2325 Title 28, U.S.C.A. to set aside and enjoin the order of the Interstate Commerce Commission, No. 32533, June 19, 1961, cited as Eastern Central Motor Carriers Association v. Baltimore and Ohio R. R., et al., 314 I.C.C. 5.

The plaintiffs, Cooper-Jarrett, Inc., Eastern Express, Inc., Eastern Motor Dispatch, Inc., Cramer Brothers Freight Lines, Inc., are common carriers, engaged in motor transportation.

Eastern Central Carriers Assoc., Inc., The Rocky Mountain Motor Bureau, Inc., National Motor Freight Traffic Assoc., Inc., and the Regular Common Carrier Conference, are regular common carriers or associations of which substantially all of the motor transport carriers subject to the jurisdiction of the I.C.C. are members, and appeared as parties in all of the proceedings before the Commission.

Upon order of this Court, the following parties were allowed to intervene in support of the Commission's report or order: The Eastern Railroads, The Transcontinental Railroads, (representing substantially all rail interests using the protested rates), the National Industrial Traffic League, six freight forwarding companies and the Freight Forwarding Institute, and various shippers: (Swift and Co., Merck and Co., Manufacturers Chemists Association, and the Drug and Toilet Preparation Conference.) The intervenors are common carriers by railroad, freight forwarders, and shippers engaged in shipping freight in Interstate Commerce.

Pursuant to §§ 2321–2325, Title 28 U. S.C.A. this review was heard before this three-judge court on the 6th day of December, 1963.

The controversy involves the rates promulgated by the rail carriers in the transportation of freight under what is known as trailer on flat car "TOFC" or "Piggy Back" service.

The Commission ruled [1] that:

"(1) the rail rates and charges on loaded or empty trailers and containers, moving in Plan III and Plan IV TOFC service and the rules in connection therewith, here under investigation, and (2) the assailed freight-forwarder volume commodity rates, are lawful, or not shown to be unlawful, as the case may be." (p. 50 of 314 I.C.C.)

Prior to 1958, five plans were adopted by the railroads for the transportation of freight under the so-called "piggy back" or "TOFC" method. The following explanation of the various plans was given by the Interstate Commerce Commission at 314 I.C.C. 8, 9:

"Under Plan I, the railroads transport loaded motor common carrier highway trailers on flatcars in line-haul movement between terminals, ramp-to-ramp, in substituted rail for motor service. The freight moves on motor-carrier billing, and the rail service is not held out to the public. The railroad compensation, under contractual arrangements, is based on a division of the motor-carrier charges and on the gross weight of the trailers and lading.

"Under Plan II the railroad provides the trailer and flatcar and performs pickup and delivery within rail terminal areas, and loading and unloading to and from the flatcar. In general, the rail rates for this service are the same as the motor common carrier rates.

"Under plan III service, the shipper provides the trailers (or containers) which he owns or leases. He delivers the loaded trailers to the rail loading ramp and arranges for their movement from the unloading ramp at the delivery point. The railroad loads the trailers onto the flatcar at origin, performs the line-haul service, and unloads the trailers from the flatcars at the rail terminal. The railroad charge is stated in amounts per flatcar, a charge of the same amount applying in the opposite direction, whether the trailers are empty or loaded. Plan III thus eliminates pickup and delivery expense, acquisition, maintenance, and depreciation charges for trailers, and all empty return mileage. The railroad pays no rental charge for the trailers, and no refrigeration, ventilation, or other protective services are furnished.

"The plan III rates and charges contemplate the handling of two

---

1. Two members separately concurring and one dissenting.

loaded or empty trailers on one rail car, and they will not apply when more than 60 percent of the total weight of the lading consists of any one article. * * *

"The service under plan IV is the same as plan III, except that the shipper provides the flatcar in addition to the container or trailer. The flatcar must be fitted with the necessary tiedown devices, approved by the railroad. Loading and securing to flatcars, and unloading and placement are at the shipper's expense. (This plan is the one used extensively by freight forwarders).

"Plan V, (not now in use), contemplates joint motor-carrier-rail service." (Pars added).

Plaintiffs here are attacking only the rates and services as approved by the I.C.C. under Plans III and IV, ante. Plan III rates and services are not in effect by the Western railroads. We see no reason why we should set out in greater detail the rates which are here in controversy. They are fully set out, described and defined in the Commission's report. 314 I.C.C. 10, 11, 12.

It is sufficient to say that plaintiffs seek to have us review the lawfulness of the rates, charges, regulations and practices of the carriers, and the order of the Commission as a whole, from the premise that the same constitute a "new method" of rate making and tariff approval by the Commission which plaintiffs assert is violative of Sections 1(3)(4)(10) and (11) of the I.C.C. Act, supra. From that position, they raise six issues, and ask us to decide whether or not:

"1. The railroads have the statutory obligation to furnish the cars, other vehicles, and all instrumentalities and facilities of shipment or carriage, and all services in connection with the handling of property transported.

"2. Compensation to shippers for furnishing instrumentalities used in or services connected with transportation other than as prescribed in the Interstate Commerce Act is unlawful.

"3. The practices of the railroads under Plans III and IV result in violations of the Elkins Act and Sections 2, 3 and 6 of the Interstate Commerce Act.

"4. The Plans III and IV rates and charges are unreasonably low and constitute an unfair and destructive competitive practice.

"5. Plans III and IV rates and charges violate requirement that rates reflect just and reasonable classifications of property.

"6. Plans III and IV rates require a violation of Section 418 of the Interstate Commerce Act when utilized by freight forwarders."

and that we make affirmative declaration as to such matter, and adjudicate that the rates and tariff provisions here to be considered are unlawful per se.

We note initially that the plaintiffs, on oral argument before this court have abandoned their contention that plans III and IV violate the requirement of the Interstate Commerce Act as to reasonable classifications of property. Hence we need not make any determination as to issue numbered (5) above.

In oral arguments, counsel for the plaintiffs also stated:

" * * * we don't think that there is anything here for Your Honors to decide as to the wisdom of the practices of the railroads with respect to the rates with respect to this business of trying to compete with private carriers.

"Second, we have never challenged and we do not here challenge the right of the railroads to provide the physical trailer-on-flatcar service under Plans 3 or 4 or any other plan. Physically, there can be no question that the railroads have the right to transport trailers on flatcars.

"Third, we do not challenge the right of the shippers to provide facilities and services for themselves,

when they utilize a part of the rail services in the transportation of trailers on flatcars.

"What is at issue, however, is the right of the railroads themselves to specify by tariffs the extent of service which they will provide as common carriers under the Interstate Commerce Act, and thereby the extent of the service which they provide to the public and which is to be subject to the Interstate Commerce Act.

"Specifically, we ask the Court to review and to appraise the Commission's decision in this case in the light of the requirements by the Interstate Commerce Act that the railroads shall provide transportation to the public on reasonable request, and that that transportation in interstate commerce shall cover all services, all charges, all allowances by tariff publication. Also the issue in the case is the right of the forwarders to provide their own railroad cars." [Trans. p. 6].

Plaintiffs' oral argument made before this court has clarified and limited the presentation of issues raised by them in their briefs. This court's determination is made upon consideration of both oral argument and the printed briefs in the record.

■ Plaintiffs first contention is that under §§ 1(3), 1(4), 1(10) and 1(11) [2] of the Interstate Commerce Act, the railroads must furnish all instrumentalities of transportation, and that in not providing flatcars and trucks under Plans III and IV at the tariffs published by them, the railroads violate the Act, supra.

The Commission held (at 314 I.C.C. 47) that the obligations of the railroads to furnish transportation are limited by the extent of what they hold out to the shipping public in their tariffs, and further that the furnishing of services under the tariffs and as required by the Act did not occur until the flatcars or trailers were placed in the possession of the railroad for the purpose of being transported. In the light of Pennsylvania R. Co. v. Ohio Public Utilities Comm., 298 U.S. 170, 56 S.Ct. 687, 80 L.Ed. 1130 (1936); Walling v. Baltimore Steam Packet Company, 144 F.2d 130 (4th Cir. 1944), the court can only agree with the Commission's determination of law respecting that matter.

The plaintiffs' contention, as we understand it, is not that the shippers *cannot* furnish their own instrumentalities, but that under the law the *rails must hold out only the full service* to the shippers, and if the shippers choose to furnish part of the facilities of transportation, this must be taken care of by published tariff rate allowance.

In the first place, we hold trailers, when used in Plan III service, to be containers rather than instrumentalities of transportation, and thus the above argument can only affect Plan IV. Allow-

---

2. "Section 1(4):
  " 'It shall be the duty of every common carrier subject to this part to provide and furnish transportation upon reasonable request therefor * * *.'
  Section 1(3):
  " ' * * * The term "transportation" as used in this part shall include locomotives, cars, and other vehicles, vessels, and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof, and all services in connection with the * * * handling of property transported. * * *'
  "Section 1(11):
  " 'It shall be the duty of every carrier by railroad subject to this part to fur-

nish safe and adequate car service and to establish, observe, and enforce just and reasonable rules, regulations, and practices with respect to car service; and every unjust and unreasonable rule, regulation, and practice with respect to car service is prohibited and declared to be unlawful.'
  "Section 1(10):
  " 'The term "car service" in this part shall include the use, control, supply, movement, distribution, exchange, interchange, and return of locomotives, cars, and other vehicles used in the transportation of property, including special types of equipment, and the supply of trains, by any carrier by railroad subject to this part.' "

ances For Use of Trailers, 299 I.C.C. 513; Forwarder Volume Rates, Chicago and New York, 308 I.C.C. 455; Eastern Express Inc. v. United States et al., 198 F. Supp. 256 (S.D.Ind.1961), affirmed 369 U.S. 37, 82 S.Ct. 640, 7 L.Ed.2d 548 (1961).

Secondly, the basic contention of plaintiffs is that Plan II service is coextensive with III and IV service in all protested instances. Therefore, all the foregoing aside, the railroads *are* holding out all instrumentalities to the shipping public under Plan II, even under the plaintiffs' contention or construction. The fact that a partial service is offered at a lower rate does nothing to impinge the fact that a *complete service is offered*.

Third, there is an internal qualification in the portion of the Act cited by the plaintiffs. That is, that the rails must offer these instrumentalities and services "upon reasonable request". There is no indication whatever that the rails have not furnished all services reasonably requested by the shippers, and it is to be noted that shippers, rather than protesting the plans, have intervened on their behalf. We must conclude that the plaintiffs' first contention is groundless.

Quoting further from the oral argument of counsel for the plaintiffs:

"The principal issue before Your Honors in this case is the manner in which the trailer-on-flatcar charges of the railroads shall be published. That includes the issue of whether they shall even be published at all.

"Now, in its initial phases this case before the Interstate Commerce Commission was presented or defended, rather, by the railroads on the ground that they had a right, where a shipper provided his trailer, to put a rate in just for that, and we said no, that so long as you are holding out your services as required by the statute for the complete service, there is only one manner whereby you can compensate the shipper for the provision of a part of the service which the law makes it your obligation to provide, and that is

Section 15(13) of the Interstate Commerce Act."

Counsel further stated:

"Now, there is our grievance. We say that there is no other way. *If the railroads want to hold out the complete service, they must make provision for this lesser service only by an allowance.*" [Emphasis supplied]

Section 15(13) in part provides:

"If the owner of property transported under this part directly or indirectly renders any service connected with such transportation, or furnishes any instrumentality used therein, the charge and allowance therefor shall be published in tariffs or schedules filed in the manner provided in this part and shall be no more than is just and reasonable, * * *."

The Hearing Examiner who presided at eight of the ten original proceedings in this rate matter, found that Plan III and IV rates violated § 15(13) in his proposed report. The Commission rejected the examiner's findings on this point at page 45 of its report, stating:

"In substance, the Examiner concluded in the proposed report in the eastern and western cases that the railroads, having established Plan II rates and charges for a complete, door-to-door TOFC service, may provide lesser services only by publishing tariff allowances to shippers who furnish a part of the instrumentalities and services which the carriers otherwise are obligated to furnish. * * *

"We are not in agreement with that position. * * * The fact that rates are published for a complete service does not prevent a carrier from offering to perform a lesser service for a lower rate. Nor when that is done, can it be said that the carrier is 'obligated' to do more than it has offered to do for the lower rate where such offer at the latter rate is accepted by the

shipper. With respect to 'allowances' obviously none can be made to the shipper for performing a service the avoidance of which is the consideration for the lower rate."

■■ We can find no illegality in such declarations as to rate making and approval thereof by the I.C.C. as plaintiffs here contend. The requirements of the Act are that the carrier must hold itself out to furnish the facilities of transportation. It is not required to furnish facilities to pick up and deliver, unless it holds itself out to do so. When it does so, it may make a reasonable charge therefor. Such additional service for such additional charge then becomes available to all who request it and are willing to pay for it.

■■ If the carrier wishes to initiate a lesser service for a lesser price, it may do so. We see no violation of the law if the carrier publishes a lower rate for carrying freight that is brought to it by the shipper. This is not the rendering of any service under the Act connected with the transportation so far as the carrier is concerned. Its responsibility as a carrier under § 15(13) of the Interstate Commerce Act, begins when the lading is delivered to it for transportation. Pennsylvania R. Co. v. Ohio Public Utilities Comm., supra.

Under Plan II the carrier's responsibility begins when it receives the freight at the shipper's dock or place of business.

Under Plan III the carrier's responsibility does not begin until the freight is delivered to it by the shipper, and such delivery by the shipper is not a part of the transportation covered by the Act.

Under Plan IV the railroad's obligation to furnish transportation under the Act does not begin until the flatcars are delivered to the railroad to be put into the line-haul operation. Thus the provisions for allowances under § 15(13) do not have application, because the services in question are not within the scope of the Act for this purpose.

■ Approaching the problem from another viewpoint, if there were only Plan II tariffs, then, of course, services performed by the shipper would have to be considered by way of published allowances credited against the Plan II tariff, but in the presence of Plan III and IV tariffs, the question of allowances has no pertinency. As was stated at page 21 of the Transcontinental Railroads' brief in the case at bar:

"In short, whether an allowance may be made to a shipper is determined by the scope of the tariff involved."

§ 15(13) is not intended to require allowances unless the service provided by the shipper is within the tariff in use in the instance under consideration. We therefore must rule against the plaintiffs in regard to their second contention.

■ Plaintiffs' third contention is that the railroads practices under Plans III and IV are violative of the Elkins Act, 49 U.S.C.A. §§ 41–43, which makes it unlawful to offer, grant, give, solicit, accept or receive any rebate, concession or discrimination and provides a penalty for so doing.

They further contend that §§ 2, 3 and 6 of the Interstate Commerce Act are violated. (These sections forbid rate discrimination by rebate, special rates, etc.; prohibit undue preferences or prejudices in regard to shippers, and make it unlawful for carriers to ship at unpublished rates.)

The answer to that contention is that there is nothing in either of these *plans* which provide for, or even suggest any "rebate, concession or discrimination". The types of service offered are available to all who wish to avail themselves of such services, and the rates are fixed and published for the type of service selected by the shipper.

Whether or not there are actually unlawful practices being indulged in in connection with Plans III and IV TOFC, really has no bearing upon the lawfulness of the plans themselves. If the rail-

roads rebate, discriminate, or indulge in unlawful preferences, or in any other way violate the Elkins or Interstate Commerce Acts, then they certainly are subject to censure and prosecution for those violations.

Such practices, however, as the railroads were shown to be engaging in, (i. e. the leasing of trailers and flatcars), are not violative of these Acts on their face, and since there is nothing in the record to prove that these leasing arrangements were used unlawfully, the Commission's decision must be upheld.

Plans III and IV rates and charges do not violate the Elkins Act or §§ 2, 3 or 6 of the Interstate Commerce Act, nor were the railroads' practices under Plans III and IV shown to be unlawful on the record before this court.

Plaintiffs' fourth contention is that Plan III and IV TOFC rates are unreasonably low and constitute a destructive competitive practice. The basis for this contention is that the rates in question were found to be below the vast majority of boxcar and plan II rates. Plaintiffs' contention is that the unreasonable lowness is injurious to the railroads and destructive of the motor freight industry.

The Commission found that the rates were not unreasonably low. The rates were found to exceed out-of-pocket costs of the railroads, and to provide a substantial contribution to the rails' overhead burden. The Commission further found that under § 15a(3) of the Act, rates of a carrier should not be held to a particular level merely to protect another mode of transportation. In addition, the Commission held that the rates were not shown to be destructive of the motor carrier industry or individual motor carriers based on the testimony and evidence under consideration in that proceeding. See 314 I.C.C. 5, l. c. 50.

There is no question but that the plans which are in dispute in the instant case have enabled the railroads to stem somewhat the flow of traffic away from the rails, and have given the rail lines some revitalization.

■ The tables provided by the I.C.C. as an appendix to its opinion (314 I.C.C. 56–64) demonstrate that the rates in all cases exceed out-of-pocket expenses, and in some instances, exceed fully distributed costs. Thus under the oft repeated test enunciated in New Automobiles In Interstate Commerce, 259 I.C.C. 475 (1945), the rates are compensatory and cannot be said to be destructive merely because of their lowness.

■ The Commission's statement that rates of a carrier should not be held up to a particular level to protect another mode of transportation is also well grounded. In New York, New Haven and Hartford R. Co. v. United States, 199 F.Supp. 635, l. c. 641, (D.C.Conn.1961), it was stated:

"Apparently the Commission thought that any rate-competition which threatens the continued existence of a competitor it had power to prevent as a 'destructive competitive practice,' irrespective of whether the challenged rates were compensatory to the proponent thereof or whether the mode of the contesting competitor was a lower-cost mode than that of the proponent. This, we hold, was an erroneous interpretation of the Act, as amended.

"Even before 1958, it would have been erroneous to hold that irrespective of other factors rates were unlawful merely because they would destroy carriers operating under different modes of transportation. In Schaffer Trans. Co. v. United States, 355 U.S. 83, 91, 78 S.Ct. 173, 178, 2 L.Ed.2d 117 (1957), it was said that '[t]he ability of one mode of transportation to operate with a rate lower than competing types of transportation is precisely the sort of "inherent advantage" that the congressional policy requires the Commission to recognize.'"

We cannot say that there was not substantial evidence to justify the Commission's finding that the rates in question were not destructive of either in-

dividual motor carriers or the motor carrier industry as a whole, as a matter of fact.

Therefore, based on the foregoing, we must conclude that the Commission was correct in deciding that the rates were not unreasonably low or destructive of competition, either in law, or in fact.

The last contention of the plaintiffs is that the use of Plans III and IV by the freight forwarders is violative of § 418 of the Interstate Commerce Act, 49 U.S.C.A. § 1018. In pertinent part, § 418 is as follows:

> "It shall be unlawful, except in the performance within terminal areas of transfer, collection, or delivery services, for freight forwarders to employ or utilize the instrumentalities or services of any carriers other than common carriers by railroad, motor vehicle, or water, subject to this Act * * *."

The plaintiffs have maintained that the providing of flatcars and trailers by freight forwarders under the plans in question violates this section. Initially, we note that as to Plan III, this argument was disposed of in Eastern Express, Inc. v. United States et al., 198 F.Supp. 256 (S.D.Ind.1961) affirmed 369 U.S. 37, 82 S.Ct. 640, 7 L.Ed.2d 548, wherein it was held:

> "With respect to the plaintiffs' argument that the assailed [freight] forwarder service is in derogation of Section 418 of the Interstate Commerce Act, in view of the reasons stated in the Commission's initial report in these proceedings, which have been stated heretofore, we concur in the conclusion of the Commission that rail shipments by the freight forwarders of their trailers, loaded or empty, under the rail Plan III Piggyback rates published by the railroads and available for the use of the shipping public, are not unlawful under said section."

The only issue that might possibly remain in contention in the case at bar is that the furnishing of flatcars under Plan IV by freight forwarders is unlawful.

We see no distinction, insofar as the law is concerned, between the well known and recognized policy of ownership of the transportation facilities, i. e., boxcars, freight cars, refrigerator cars, oil tank cars and other types of cars or by private owners and shippers and transported in line-haul by the carrier, and the Plan IV where the forwarder supplies the flatcar either by lease from private owners of flatcars or from the railroad company itself, if the rates and tariffs are properly published and are available and open to all shippers to make use of such facilities for the recognized tariffs that are charged by the carrier.

As the Commission stated in Forwarder Volume Commodity Rates Chicago and New York, 308 I.C.C. 455, l. c. 461 (1959), (this was the original proceeding under protest in the Eastern Express case just cited):

> "Aside from the question of whether trailers when loaded on flat cars are instrumentalities or containers, there is no contention that the ordinary shipper may not furnish the trailers under Plan III rates, and we think likewise that they may be furnished by the forwarders."

█ It has been amply demonstrated by the evidence that the intent of the Legislature in adopting § 418 was to prevent the use of contract carriers by freight forwarders, and not to prevent the freight forwarders from using their own instrumentalities and containers. Commissioner Eastman drafted the bill which became the Freight Forwarder Act, and in reference to § 418, had this to say:

> "It also seems desirable that forwarding companies should be confined to the use of the instrumentalities or services of common carriers, and should not be permitted to utilize those of contract carriers. A contract carrier is a species of private carrier which does not serve the

general public but confines itself to specialized service for particular shippers. A forwarding carrier, insofar as it utilizes the services of other carriers, is technically a shipper, but its predominant status is that of a common carrier serving the general public. The shipments which it tenders to other carriers are aggregations of the individual shipments of the general public which it serves. The public function which it performs is that of an agency through which these individual shippers can act collectively and thus secure a more efficient and economic handling of their shipments than would otherwise be possible. The use of contract carriers is inconsistent with this public purpose, and may also be detrimental to the common carriers, to whom forwarding operations properly conducted can be of much advantage." *

Plaintiffs state in their Reply Brief that the intent of the Legislature cannot be grounds for varying the plain language of a statute. However, the language of the statute in question is far from being plain, when taken in connection with the situation which confronts the court in the instant case.

The construction which the plaintiffs urge is certainly not apparent from an initial reading of § 418. In this instance the court may clearly seek light from the legislative history of the statute. See II Sutherland on Statutory Construction, Chapter 45, §§ 4503–4508, Chapter 47, § 4702.

We find that the Commission in its expertise correctly held that Plans III and IV, and the rates and charges thereunder, are not violative of § 418 of the Interstate Commerce Act when used by freight forwarders.

Based on the record as a whole, we find that the Interstate Commerce Commission's determination of the fact issues in the instant case was based on substantial evidence. The Commission's decision is in accordance with the law. Accordingly, the plaintiffs' application for injunction is denied, and the Complaint is dismissed.

---

* Commissioner Eastman's letter, together with the draft bills, is in the bound volume of the Interstate Commerce Commission library with the title "Eastman, Joseph Bartlett, A Letter * * * Submitting a Draft of Legislation Providing for Regulation * * * of the So Called Forwarding Companies, 1940," reference number H. E. 2311U543.