**POTOMAC ELECTRIC POWER COMPANY, Petitioner,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents,**

**Consolidated Rail Corporation, Intervenor.**

**No. 77–1494.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 3, 1978.

Decided Aug. 2, 1978.

---

J. Raymond Clark, Washington, D. C., for petitioner.

Kenneth G. Caplan, Atty., I. C. C., Washington, D. C., with whom Mark L. Evans, Gen. Counsel, and Charles H. White, Jr., Associate Gen. Counsel, I. C. C., Barry

Grossman, and Edward Lawson, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondents.

John A. Daily, Christopher C. DeMuth, and Richard J. Murphy, Philadelphia, Pa., were on the brief, for intervenor.

Before TAMM and ROBB, Circuit Judges, and RONALD N. DAVIES,* Senior District Judge for the District of North Dakota.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

Potomac Electric Power Co. (PEPCO) seeks review of an order[1] of the Interstate Commerce Commission (Commission) refusing to hold unreasonable certain rates published by Penn Central Transportation Co. (Penn Central) for unit-train shipments of coal, or the failure and refusal of Penn Central to provide and publish rates for unit-train service in carrier-furnished cars.[2] Although we agree with the Commission concerning the failure of Penn Central to provide and publish rates for unit-train service in carrier-furnished cars, we remand the case to the Commission for further proceedings concerning the reasonableness of the rates in question.

## I

PEPCO receives shipments of coal transported by railroad from mines in Pennsylvania and West Virginia to three of its electric generating stations in Maryland—Chalk Point, Morgantown, and Dickerson.[3] For a number of years, Penn Central provided conventional "trainload" service to the Morgantown and Chalk Point stations, a service now provided by intervenor Consoli-

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. Report & Order of the Commission, Division 2, No. 36114, decided April 1, 1977; Joint Appendix (J.A.) at 82.

2. Intervening is Consolidated Rail Corporation (Conrail). See Fed.R.App.P. 15(d).

3. J.A. at 83; Brief of Petitioner Potomac Electric Power Co. (PEPCO) at 6.

dated Rail Corp. (Conrail).[4]  For a number of reasons, PEPCO began in approximately 1973–74 to increase dramatically its actual use of coal and its projections for the future.[5]  Penn Central's trainload service proved unreliable, most particularly with respect to railroad car supply.  In response to this situation, PEPCO entered into discussions with Penn Central concerning the addition of so-called "unit-train" service to the Chalk Point and Morgantown stations.[6]  Unit-train service is a system in which cars and locomotives are joined for an uninterrupted, round trip, shuttle-type service, and is regarded as an efficient method of transporting coal in large volumes.[7]

Although PEPCO requested Penn Central to publish alternative rates based first, upon unit-train service utilizing PEPCO-furnished cars, and second, upon unit-train service utilizing carrier-furnished cars,[8] Penn Central agreed only to publish rates for and provide service in PEPCO-furnished cars.[9]  Penn Central advised PEPCO that the unit-train rate for such service would be between 50 and 60 cents per ton below the trainload rate, after which PEPCO placed an order to buy cars.[10]  Penn Central then specified an exact rate of 52 cents per ton

below the corresponding trainload rates.[11]  Although PEPCO was not satisfied with the announced rate, it advised Penn Central to proceed with publication of its tariff containing the rate in question.[12]  This tariff became effective in November 1974.

PEPCO instituted this proceeding on December 23, 1974, by filing a complaint with the Interstate Commerce Commission.[13]  In its complaint, PEPCO alleged, *inter alia,* that the published rates on unit-train shipments to its Chalk Point and Morgantown stations and certain published rates on trainload shipments to these two stations and to its Dickerson station were unreasonable.[14]  PEPCO also challenged Penn Central's refusal to provide and publish rates for unit-train service in carrier-furnished cars.[15]  PEPCO sought reparations from Penn Central, the prescription of reasonable rates for trainload service, and the prescription of reasonable rates for unit-train service in both PEPCO-furnished and carrier-furnished cars.[16]  After a hearing, the Commission's administrative law judge (ALJ) denied all relief.[17]

Upon the filing of exceptions to the initial decision of the ALJ by PEPCO, the Commission, Division 2, affirmed the initial

---

4.  Brief of Petitioner PEPCO at 6.  Conrail assumed Penn Central Transportation Co.'s (Penn Central) rail operations on April 1, 1976.  Brief of Intervenor Conrail at 3 & n. 2; *see Consolidated Rail v. ICC,* No. 77–1125, slip op. at 6–7 & n.8 (D.C.Cir. June 27, 1978).

5.  J.A. at 83–84.

6.  *See id.* at 86, 128.

7.  Brief of Petitioner PEPCO at 6; *see* 49 U.S.C.A. § 1(12) (1978), which defines "unit-train service" as "the movement of a single shipment of coal of not less than 4,500 tons, tendered to one carrier, on one bill of lading, at one origin, on one day, and destined to one consignee, at one plant, at one destination, via one route."
    For a discussion of the development of unit-train service, see Ex parte No. 270 (Sub-No. 4), Investigation of Railroad Freight Rate Structure—Coal, 345 I.C.C. 71, 111–17 (1974), *aff'd in part and discontinued,* 345 I.C.C. 493 (1976).  The Interstate Commerce Commission (Commission) has stated that there is considerable uncertainty about the use of the term "unit-train," but that its most basic feature is "the

repeated movement of dedicated cars as a single unit."  345 I.C.C. at 514.

8.  J.A. at 135.

9.  Brief of Petitioner PEPCO at 6, 32.

10.  J.A. at 86 & n. 7.

11.  *Id.* at 107; Brief of Petitioner PEPCO at 15 & n. 4.  At one point, the Commission stated the rate was 53 cents per ton below the trainload rate.  J.A. at 86 n. 7.

12.  J.A. at 86.  The rates and service in question were provided under Penn Central Local Unit Train Tariff (LUTT).  *Id.* at 85 & n. 5.

13.  *Id.* at 86.

14.  Brief of Petitioner PEPCO at 4.  *See* 49 U.S.C. § 1(5) (1970).

15.  J.A. at 5.

16.  *Id.* at 5–6.

17.  *Id.* at 6, 9.

decision, with the exception of the ALJ's conclusion that the trainload rates to the Dickerson station were not shown to be unreasonable.[18] The Commission ruled that the trainload rates on shipments to the Dickerson station were unreasonable because the rate-to-variable cost ratio (expressed as a percentage) of 246.6 percent applicable to such shipments was excessive as compared to the rate-to-variable cost ratios of 179.4 and 178.0 percent applicable to trainload shipments to the Morgantown and Chalk Point stations, respectively.[19] The Commission ordered that the proceeding be reopened for the limited purpose of receiving evidence on the maximum reasonable level of trainload rates to the Dickerson station.[20] Commissioner (now Chairman) O'Neal concurred in the decision stating in a separate opinion that he would have found the unit-train rates to be unjust and unreasonable to the extent that they resulted in rate-to-variable cost ratios in excess of 200 percent.[21]

PEPCO sought a declaration that an issue of general transportation importance was involved in order to obtain reconsideration by the entire Commission of the decision of Division 2.[22] The Commission denied PEPCO's petition for such a declaration by order dated May 6, 1977.[23] In this court, PEPCO challenges the Commission's decision with respect to the unit-train rates and service.

## II

We note at the outset that review of a decision of the Interstate Commerce Commission involving rates is limited in scope—such a decision should stand unless it is unsupported by evidence, or made without a hearing, or in excess of constitutional limits, or, for some other reason, constitutes an abuse of power. *Manufacturers Railway v. United States*, 246 U.S. 457, 481,

38 S.Ct. 383, 62 L.Ed. 831 (1918); *accord, Atchison, Topeka & Santa Fe Railway v. Wichita Board of Trade*, 412 U.S. 800, 806, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973) (principal opinion) (Marshall, J.). Moreover, we are aware that in assailing published rates as unreasonable and requesting the Commission to prescribe just and reasonable rates, the complainant bears the burden of proving the alleged unreasonableness. *Swift & Co. v. United States*, 343 U.S. 373, 382–83, 72 S.Ct. 716, 96 L.Ed. 1008 (1952). However, even with these limitations, a court reviewing a Commission decision must be able to discern from the decision the reasons for the Commission's conclusions and the policies it is pursuing. As Mr. Justice Cardozo stated: "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." *United States v. Chicago, Milwaukee, St. Paul & Pacific Railroad*, 294 U.S. 499, 511, 55 S.Ct. 462, 467, 79 L.Ed. 1023 (1935); *see Atchison, Topeka & Santa Fe Railway v. Wichita Board of Trade*, 412 U.S. at 805–07, 93 S.Ct. 2367.

## III

PEPCO first contends that the Commission erred in failing to find unreasonable the refusal of the railroad to provide and publish rates for unit-train coal transportation in carrier-furnished cars. This refusal, PEPCO alleges, violates section 1(4) of the Interstate Commerce Act (Act), 49 U.S.C. § 1(4) (1970), which states that "[i]t shall be the duty of every common carrier . . . to provide and furnish transportation upon reasonable request therefor . . . ."[24] Section 1(3) of the Act, 49 U.S.C. § 1(3) (1970), states that " 'transportation' . . . shall include . . . cars . . . irrespective of ownership or of any contract, express or implied, for the use thereof . . . ."

---

18. *Id.* at 82, 100–01.

19. *Id.* at 94.

20. *Id.* at 101.

21. *Id.*

22. *Id.* at 112–14; *see* 49 U.S.C.A. § 17(9)(d) (1978).

23. J.A. at 118.

24. Brief of Petitioner PEPCO at 8.

The Commission [25] responds that PEPCO has cited no case law, and that it is unaware of any, that would require carriers to provide unit-train service in carrier-furnished cars.[26] In the administrative proceedings, the Commission pointed out that the record reflected that the PEPCO plants in question were served with carrier-furnished cars under trainload rates, that most unit-train tariffs do not provide for carrier-furnished cars, and, consequently, that PEPCO established no unlawfulness in the refusal of the railroad to provide cars for the service in question.[27]

We agree. Penn Central's trainload tariff governing service to the Chalk Point and Morgantown stations provided for service in carrier-furnished cars. See Joint Appendix (J.A.) at 84 & n.2. To the extent that the railroad was obligated to hold out service utilizing carrier-furnished cars, its offering of the trainload service satisfied this obligation. The fact that the railroad offered, in addition, a partial service at a lower rate does not detract from the fact that a service in cars provided by the railroad was offered at a full rate. *Cooper-Jarrett, Inc. v. United States*, 226 F.Supp. 318, 323 (W.D. Mo.) (three-judge court), *aff'd*, 379 U.S. 6, 85 S.Ct. 49, 13 L.Ed.2d 21 (1964) (per curiam). In these circumstances, the railroad's failure to hold out a complete unit-train service did not violate the Interstate Commerce Act.

Moreover, a railroad's obligation to furnish transportation is defined by what it holds out to the public in its tariffs, *Eastern Central Motor Carriers Association v. Baltimore & Ohio Railroad*, 314 I.C.C. 5, 45–47 (1961), *complaint dismissed sub nom. Cooper-Jarrett, Inc. v. United States*, 226 F. Supp. at 322–27, and the furnishing of transportation under the unit-train tariff in question did not occur until the PEPCO-furnished cars were placed in the possession of the railroad for the line-haul movement.[28] Thus, we agree with the Commission that PEPCO's initial allegation of error is without merit.[29]

## IV

PEPCO contends that the Commission should have declared the unit-train rates unreasonable because they were only 52 cents per ton below the corresponding trainload rate instead of the full 66.6 cents per ton that a railroad study showed would be saved by the railroad as a consequence of PEPCO's providing the coal cars.[30] The Commission refused to find the rates unreasonable on this basis, emphasizing that the calculated cost savings were of questionable value because they were based on assumed

**25.** Respondents United States of America and the Commission filed a joint brief, Joint Brief for the Interstate Commerce Commission and the United States (Joint Brief).

**26.** Joint Brief at 25.

**27.** J.A. at 100.

**28.** Section 310 of the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S. C.A. § 1(12) (1978), provides that, in making reasonable distribution of coal cars, unit-train service and non-unit-train service shall be considered separately, and that coal cars furnished by shippers or receivers shall not be considered part of the carrier's fleet. See 121 Cong.Rec. 34888 (1975) (remarks of Senator Ford). The practice of acquiring cars by utility companies to assure transportation of necessary coal apparently is not a new one. See *Assigned Car Cases*, 274 U.S. 564, 568, 47 S.Ct. 727, 71 L.Ed. 1204 (1927); 121 Cong.Rec. 38444 (1975).

**29.** The only case relied upon by PEPCO in its brief is an unreported decision of Review Board

Number 4 of the Commission, Public Serv. Co. v. Penn Central Transp. Co., No. 35481, decided June 4, 1973. In that case, the Commission refused, in the first instance, to prescribe a rate for unit-train service in which the shipper, rather than the carrier, would provide cars and other equipment. Report & Order at 3 n.4, 5–6. The Commission refused to prescribe rates before they were set by the railroad because to do so would interfere with the managerial discretion granted to carriers in the first instance in publishing rates. *Id.* at 6 (citing *Hanna Mining Co. v. Missouri Pac. R.R.*, 332 I.C.C. 166, 170 (1968)). The Commission explicitly recognized that the shipper and the carrier would "be free to negotiate rates . . . to cover a service wherein [the railroad] will provide less than the complete transportation." Report & Order at 6. We do not think this decision supports PEPCO's argument.

**30.** Brief of Petitioner PEPCO at 2, 8.

operations and service characteristics that varied from the actual ones.[31] It also concluded that although the extent to which a carrier passes on cost savings to a shipper or receiver who provides cars might be relevant in assessing the reasonableness of an allowance for such service, it was not a factor in assessing the overall reasonableness of the rate in question.[32]

In its brief, PEPCO offers no authority for its assertion that the Commission should have found the rates to be unreasonable solely on the basis that the railroad failed to pass on the full cost savings to PEPCO.[33] Moreover, PEPCO overlooks the Commission's conclusion that the railroad's calculated cost saving of 66.6 cents per ton was not valid. However, it is clear that PEPCO's argument cannot prevail because in rate-making flexibility is necessary and rigid formulae such as that asserted have no place. *Baltimore & Ohio Railroad v. United States*, 345 U.S. 146, 150, 73 S.Ct. 592, 97 L.Ed. 912 (1953). *See generally* W. Jones, Regulated Industries, 400–04 (2d ed. 1976).

### V

■ PEPCO asserts that in deciding upon the reasonableness of the unit-train rates in question, the Commission should have compared the rate-to-variable cost ratios on the unit-train shipments to the average rate-to-variable cost ratios for movements of eastern shipments of coal.[34] The Commission recognized that "some evidentiary weight" should be given to these average figures because "the comparison of a specific ratio to a territorial average is probative, although far from conclusive, in de-

termining reasonableness of a given rate."[35] In determining the reasonableness of the trainload rates, it is clear that the Commission gave consideration to the average ratios.[36] However, when the Commission turned its attention to the reasonableness of the unit-train rates, there is no indication that it considered the average rate-to-variable cost ratios for eastern shipments.[37] Because it is our duty to assure that the Commission gave reasoned consideration to a factor that it concluded was pertinent, *see Permian Basin Area Rate Cases*, 390 U.S. 747, 792, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968), we must remand this aspect of this case.

### VI

■ An additional reason for remanding that portion of the case that deals with the reasonableness of the unit-train rates is that we are unable to discern the reasons for certain Commission actions or the policies being pursued. *See* text *supra* at —— —— of 190 U.S.App.D.C., at 1062 of 584 F.2d. The Commission must demonstrate that it gave reasoned consideration to the issues involved, and that it reached a result that flows rationally from its analysis. *National Association of Food Chains v. ICC*, 175 U.S.App.D.C. 346, 352–353, 535 F.2d 1308, 1314–15 (1976) (per curiam) (citing *Greater Boston Television Corp. v. FCC*, 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971)).

PEPCO complains that the Commission's failure to find the unit-train rates unrea-

---

**31.** J.A. at 99.

**32.** *Id.*

**33.** *See* Brief of Petitioner PEPCO at 8.

**34.** *Id.* at 2–3, 8–9; *see* J.A. at 87 & n.9. The rate-to-variable cost ratios ranged from 181 to 229 percent on the unit-train shipments to Morgantown and Chalk Point. J.A. at 88. The Commission has defined "variable costs" as "the variable portions of freight operating expenses, rents and taxes (excluding Federal income taxes), and . . . the variable portion of the 'cost of capital,' excluding any allowance for Federal income taxes." Investigation of

Railroad Freight Rate Structure—Coal, 345 I.C.C. at 226.

**35.** J.A. at 92. Although the Commission's statement on this point is contained in the portion of its opinion dealing with trainload rates, the statement refers to both trainload and unit-train rates. *Id.*

**36.** *Id.*

**37.** PEPCO asserts the average ratio for volume shipments to be 127.1 percent. Brief for Petitioner PEPCO at 28; *see* J.A. at 96–100.

sonable cannot be reconciled with its conclusion in the very same decision that certain trainload rates reflecting a rate-to-variable cost ratio of 246.6 percent were unreasonable. As noted, the rate-to-variable cost ratios on the unit-train shipments ranged from 181 to 229 percent.[38] In the portion of its decision in which it considered trainload rates,[39] the Commission recognized that cost of service and, concomitantly, rate-to-variable cost ratios, are factors in determining the reasonableness of rates,[40] and that comparisons of rate-to-variable cost ratios may be relevant.[41] Noting that "the record does permit a comparison of rate-to-variable cost *ratios* among the three generating stations operated by complainant," the Commission ruled that a ratio of 246.6 percent for trainload movements to the Dickerson station was excessive when compared with the ratios of 179.4 and 178.0 percent on trainload shipments to the Morgantown and Chalk Point stations, respectively.[42] In further administrative proceedings not now under review, the Commission concluded that "for the future, a revenue-to-variable cost ratio of 190 percent on the Dickerson traffic is both reasonably related to the revenue-to-variable cost ratios to Chalk Point and Morgantown and provides the carrier with a greater return for the shorter haul."[43]

However, the Commission did not compare the ratios applicable to unit-train shipments with those applicable to the trainload shipments; nor did it compare the ratios applicable to the different unit-train shipments among themselves.

Presumably with respect to the comparison of unit-train ratios to trainload ratios, the Commission asserts in its brief that PEPCO "seeks to compare apples and oranges."[44] The Commission baldly asserts that "specific trainload rates simply cannot be compared to unrelated unit-train rates in the manner implied by the petitioner."[45] Although we understand why comparisons of the *rates* for the different types of service may not be relevant, on the basis of the materials that have been submitted and oral argument, we are unable to understand why comparisons of rate-to-cost *ratios* of the two modes of service, applicable to the same commodity, should not be relevant. We do not hold that such ratios must be similar. However, we cannot affirm without being able to assure ourselves that the Commission considered the discrepancies in the ratios that appear to exist in this case, and that it had reason for concluding such discrepancies were either justifiable or not relevant.[46] Moreover, it is unclear why the Commission failed to compare the discrepant rate-to-cost ratios applicable to the different unit-train shipments themselves,[47] as

38. *See* note 34 *supra.*

39. J.A. at 91–95.

40. *Id.* at 92.

41. *See id.* at 94.

42. *Id.* (emphasis in original).

43. *Potomac Elec. Power Co. v. Penn Cent. Transp. Co.,* Report & Order of the Commission on Further Hearing, Division 2, ICC Docket No. 36114, decided October 21, 1977, at 30. This decision was reconsidered and found proper by Report & Order of the Commission on Reconsideration, Docket No. 36114, decided April 7, 1978.

44. Brief of Respondents at 26.

45. *Id.*

46. In the April 7, 1978, Report & Order of the Commission on Reconsideration, concerning a

related portion of the Commission's proceedings not now under review, *see* note 43 *supra,* the Commission suggested that a reason for allowing unit-train rate-to-variable cost ratios to be higher than otherwise comparable trainload rate-to-variable cost ratios would be to encourage expansion of less costly unit-train service. Docket No. 36114, decided April 7, 1978, Report & Order at 10–11. However, this possible justification was not raised or discussed in the decision now under review. Whether the Commission would or could find the disparities in the rate-to-variable cost ratios in question justifiable on such grounds is a question that we need not and expressly do not address. *See SEC v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *National Ass'n of Food Chains v. ICC,* 175 U.S.App.D.C. 346, 354, 535 F.2d 1308, 1316 (1976) (per curiam).

47. *See* note 34 *supra.*

it did for the trainload shipments. A remand of this case for further proceedings will give the Commission the opportunity to consider and discuss these issues.

■ On remand, the Commission should also address PEPCO's allegations concerning the inconsistent treatment given in Commission decisions to cost ratios as a factor in determining the reasonableness of unit-train utility coal rates. *See* Brief of Petitioner PEPCO at 23–25. Although we recognize that the Commission may decide what relative weight is to be given to the pertinent factors, *Board of Trade v. United States,* 314 U.S. 534, 546, 62 S.Ct. 366, 86 L.Ed. 432 (1942), if the agency has set a precedent and is changing its course, it must supply a reasoned analysis for so doing, *see Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. at 394, 444 F.2d at 852.

### VII

One further matter must be discussed. At the time of PEPCO's complaint, 49 U.S.C. § 1(5) (1970) provided:

> All charges made for any service rendered or to be rendered in the transportation of passengers or property . . . shall be just and reasonable, and every unjust and unreasonable charge . . . is prohibited and declared to be unlawful.

Section 202 of the Railroad Revitalization and Regulatory Reform Act of 1976 amended 49 U.S.C. § 1(5) (1970) to make it inapplicable to common carriers by railroad, 49 U.S.C.A. § 1(5)(a) (1978), and added a new subsection (b), which provides, in part:

> Each rate for any service rendered or to be rendered in the transportation of persons or property by any common carrier by railroad . . . shall be just and reasonable. . . . Notwithstanding any other provision of this chapter, no rate shall be found to be unjust or unreasonable, or not shown to be just and reasonable, on the ground that such rate

exceeds a just or reasonable maximum for the service rendered or to be rendered, unless the Commission has first found that the proponent carrier has market dominance over such service.

49 U.S.C.A. § 1(5)(b) (1978). Market dominance "refers to an absence of effective competition from other carriers or modes of transportation, for the traffic or movement to which a rate applies." 49 U.S.C.A. § 1(5)(c)(i) (1978).

■ The new amendments to 49 U.S.C. § 1(5) (1970) require the Commission to make a finding of market dominance over a service before it can find a rate for railroad service to be unreasonable or unjust. 49 U.S.C.A. § 1(5)(b) (1978). The Commission has adopted regulations implementing the new amendments. 41 Fed.Reg. 44183 (1976); 42 Fed.Reg. 39390 (1977).[48] At the present time, under 49 U.S.C.A. § 15(9) (1978), the Commission must make a market dominance determination within 90 days after a proceeding is commenced.

■ Because the inadequacies of the Commission's decision necessitate a remand for further proceedings concerning the reasonableness of the challenged rates, we are faced with the question of the appropriate law to be applied on remand. The general rule concerning the effect of a change in law pending appeal is that an appellate court applies the law in effect at the time of its decision unless to do so would be manifestly unjust or in contravention of statute or the expressed intent of Congress. *Bradley v. School Board,* 416 U.S. 696, 710–16, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974).

In mandating the "market dominance" determination, Congress manifested its conviction that rates are best set by the forces of competition in those situations in which competition exists. The market dominance provision limited the Commission's jurisdiction to declare a rate unreasonably high to those cases in which competition was ab-

---

**48.** This court upheld the market dominance regulations, in all but one respect, in *Atchison, Topeka & Santa Fe Ry. v. ICC [Market Dominance],* 188 U.S.App.D.C. 360 at 372–373, 580 F.2d 623 at 635–636 (May 2, 1978). The provision that was not upheld was not invalidated, but was remanded for clarification. *Id.* at 377, 580 F.2d at 640.

sent. *See* S.Rep. No. 94–595, 94th Cong., 2d Sess. 148–49 (1976); H.R.Rep. No. 94–725, 94th Cong., 1st Sess. 69–70 (1975).

■ Although the proceedings in this case were commenced prior to enactment of the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, 90 Stat. 31, we believe that the strong congressional conviction that rates should be set by competitive forces when such forces exist makes this an appropriate case for application, on remand, of the general rule that law existing at the time of appeal should be applied. *Thorpe v. Housing Authority*, 393 U.S. 268, 281–83, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969). We do not decide whether the change in law in itself would necessitate a remand. *Cf. Burlington Northern, Inc. v. United States*, 555 F.2d 637, 640 (8th Cir. 1977) (no error in Commission's failure to find market dominance before holding rate unreasonable when proceeding begun prior to enactment of new law). We merely decide that on remand, the Commission should conduct its proceedings concerning the reasonableness of the challenged rates in accordance with existing law.

### VIII

For the foregoing reasons, we vacate so much of the Commission's Report and Order as concerns the reasonableness of the unit-train rates, and remand this case for further proceedings not inconsistent with this opinion. In all other respects, the decision of the Commission is affirmed.

*Affirmed in part; remanded in part.*