CONTINENTAL GRAIN COMPANY, Petitioner,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents.

ILLINOIS CENTRAL GULF RAILROAD COMPANY, Petitioner,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents.

Nos. 77–1870, 78–1608.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 26, 1979.

Decided June 19, 1979.

---

Richard J. Hardy, with whom Charles W. Chapman, Washington, D. C., and Rodman Kober, New York City, were on brief, for petitioner in No. 77–1870.

John H. Doeringer, of the bar of the Seventh Circuit, pro hac vice by special leave of Court, Chicago, Ill., for petitioner in No. 78–1608.

Christine N. Kohl, Deputy Associate Gen. Counsel, with whom Mark L. Evans, Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, I. C. C. and William D. Coston, Atty., Dept. of Justice, Washington, D. C., were on brief, for respondents.

Robert B. Nicholson, Atty., Dept. of Justice, Washington, D. C., for respondent United States of America.

Before ROBB and WILKEY, Circuit Judges, and RICHEY,* District Judge.

Opinion for the Court filed by CHARLES R. RICHEY, District Judge.

* Charles R. Richey, of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

CHARLES R. RICHEY, District Judge:

The Continental Grain Company (hereinafter, "Continental") and the Illinois Central Gulf Railroad Company (hereinafter, "ICG") petition the Court to set aside orders of the Interstate Commerce Commission (hereinafter, "ICC" or "the Commission") in ICC Docket No. Ex Parte 307, *Investigation Into the Distribution and Manipulation of Rail Rolling Stock to Depress Prices on Certain Grain Shipments for Export*, 357 I.C.C. 891 (1977). In the portions of the orders challenged in the instant action, the Commission concluded that a grain shipping arrangement between Continental and ICG, the Lake Calumet Harbor Shuttle (hereinafter, "Cal Harbor Shuttle" or "the Shuttle") violated the Interstate Commerce Act, 49 U.S.C. § 1 *et seq.*, (hereinafter, "the ICA") and the Elkins Act, 49 U.S.C. § 41 *et seq.*, (hereinafter, "the Act"). The Commission instructed the petitioners to cease and desist operations of the Cal Harbor Shuttle, and ordered its Bureau of Investigation and Enforcement (hereinafter, "BIE"), to further investigate "specific instances of possible violations of the Elkins Act." 357 I.C.C. at 899. The petitioners argue that the Commission lacked jurisdiction over the subject matter of the investigation, unfairly singled out the Cal Harbor Shuttle, failed to explicate an intelligible foundation for its decision, and had no basis in fact or law to find that grain merchandisers received valuable consideration within the prohibitions of the Elkins Act.

On review, the Court is persuaded that the Commission has failed to draw any meaningful distinction between the operation of the Cal Harbor Shuttle and similar arrangements which received ICC approval. Accordingly, the challenged portions of the orders are set aside as arbitrary, capricious, and not supported by substantial evidence on the record.

1. "Unit-train service is a system in which cars and locomotives are joined for an uninterrupted round trip, shuttle-type service . . . ." *New England Grain & Feed Council v. Interstate Commerce Commission,* 194 U.S.App.

## I. BACKGROUND.

The facts in this case are somewhat complex; however, a complete understanding of the circumstances the Commission faced greatly simplifies the question of law presented to this Court.

The standard arrangement by which grain is moved from the farm to the coast for exportation generally involves several transactions. First, the farmer sells his or her grain to a nearby rural elevator. Then, the rural elevator sells the grain to an exporting company, such as the petitioner Continental. Finally, the railroads move the grain in jumbo grain hoppers to export elevators on the coast. Traditionally, the rural elevator operators, who are the consignors of the grain sold to the exporters, contract with the railroads for the shipment of the grain to the coast. 357 I.C.C. at 820.

Late in 1973, the American grain transportation system was severely tested by an unprecedented supply of grain heading toward exportation as a result of the first purchase of grain by Russia. 357 I.C.C. at 820–21. An innovative grain transportation arrangement, called the unit-train,[1] was employed to more efficiently and expeditiously move the grain from the farms to the coast. 357 I.C.C. at 824. Grain is traditionally shipped by the carload. The unit of shipment for a unit-train is the capacity of the train over a specified period of time, during which the train is kept exclusively in the service of a particular user. Thus, unit-trains shuttle between the coast and the rural elevators, where grain is continuously tendered in amounts equal to the unit-trains' capacity. The unit-train system eliminates between-trip interruptions of conventional rail service such as the wait for new assignments.

In general, unit-trains are operated at special rates. 357 I.C.C. at 824. However, if the user of the service fails to continually tender grain sufficient to match the train's capacity, the rate shifts to the higher stan-

D.C. 362, 364 n.2, 598 F.2d 281, 283 n.2 (1979) (quoting *Potomac Electric Power Co. v. United States,* 190 U.S.App.D.C. 77, 81, 584 F.2d 1058, 1061 (1978)).

dard single-car rate on the total shipment. Thus, unit-train operations are effectively limited to those who deal in the requisite volume and are able to fill the train on the farm end of the shuttle. 357 I.C.C. at 869. Accordingly, the party contracting for transportation of the grain has changed: traditionally, the rural elevator operators (consignors) contract with the railroads to transport the grain, while large grain exporters (consignees) enter into unit-train transactions with the railroad.

When the severe grain glut emerged in 1973, the exporters tied up the supply of trains through unit-train arrangements. 357 I.C.C. at 873. Once the market in cars was cornered, the grain exporters engaged in the practice of discounting. 357 I.C.C. at 831–39. Under this practice, the grain exporters offer the rural grain elevator operators a choice between two bids for their grain: (1) a higher price which is available only if the elevator arranges for the transportation of the product to the coast; and (2) a lower price under which the grain exporter takes responsibility for transportation. 357 I.C.C. at 858. As a result, many rural export elevator operators complained to the Commission that the railroads artificially created the equipment shortage by inequitably distributing the cars to favor the large grain exporters. On its own motion, the Commission began its investigation, naming all railroads subject to its jurisdiction as respondents as well as six grain companies.

At the proceeding before the agency, the BIE proposed rules that would eliminate the consecutive-trip feature of the unit-train operations. 357 I.C.C. at 868. The Commission flatly rejected this recommendation and strongly endorsed the unit-train concept as an efficient and innovative improvement in rail transportation. 357 I.C.C. at 874. Nevertheless, the Commission adopted the "rule-of-five" so that carriers would retain the right to interrupt unit-train operations in periods of emergency car shortages. 357 I.C.C. at 874–75. It was thought by the I.C.C. that this would dissolve the long-term bonds which had frozen the transportation market during 1973. 357 I.C.C. at 875. The rule-of-five requires that

unit-train tariffs "clearly set forth the carrier's ability to terminate unit-train operations after five trips (or fewer) in the event an emergency car shortage is found to exist by the Commission." 357 I.C.C. at 875. In its order, the Commission instructed all railroads subject to its jurisdiction to cancel their unit-train contracts except those which complied with the rule-of-five. The rule-of-five has not been challenged.

In the portion of the order challenged in the instant action, the Commission ordered the ICG and Continental to cease and desist operations of the Cal Harbor Shuttle and instructed the BIE to investigate further ICG and Continental for specific Elkins Act violations. 357 I.C.C. at 899.

The Cal Harbor Shuttle operated as a modified unit-train for five consecutive months during 1973. The Shuttle carried grain from Iowa origins on ICG lines to Continental's export elevator at Lake Calumet Harbor, Illinois. The train was operated by ICG crews and about forty (40) of the cars in the train were owned by Continental, and about twenty (20) were owned by ICG. The Shuttle operated under single-car tariffs. Thus, there was no unit-train rate concession. Furthermore, there was no minimum trip requirement as was the practice for unit-trains. Thus, the railroad was free at any time to withdraw its cars and crews from the Cal Harbor Shuttle service.

The proceeding before this Court rests on sections 2321, 2322, 2341, 2343, 2344, 2347, and 2349 of Title 28 U.S.C., which collectively grant to the courts of appeals the power to review orders of the I.C.C. The appeal of ICG was originally docketed in the Sixth Circuit, but was transferred to this circuit and consolidated with Continental's case.

II. THE COMMISSION'S DETERMINATION THAT THE OPERATIONS OF THE CAL HARBOR SHUTTLE VIOLATED THE INTERSTATE COMMERCE ACT IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD.

Section 1(11) of the ICA requires every common carrier to "furnish safe and

adequate car service and to establish, observe, and enforce just and reasonable . . . practices with respect to car service." 49 U.S.C. § 1(11). Section 1(10) of the ICA defines car service to include, "the use, control, distribution, and return of carrier equipment." 49 U.S.C. § 1(10). The Commission concluded that the ICG violated the ICA by "relinquishing control" and "unlawful[ly] delegat[ing] . . . the distribution decision" to Continental by "opting to allow consignees to designate a return loading point for carrier equipment without regard to traditional car distribution factors." 357 I.C.C. at 872.

Portions of the Commission's decision indicate that the agency was concerned with the fact that consignees rather than consignors were ordering cars from the railroad. 357 I.C.C. at 872. On this appeal, the Commission has abandoned any attempted distinction on such grounds. Joint Brief for Respondents Interstate Commerce Commission and United States of America at 33–34 (September 29, 1978). Since the Commission has not rebutted the presumption of equal treatment of consignors and consignees, it cannot fashion discriminatory rules. *See American Trucking Associations, Inc. v. Atchison, Topeka, & Santa Fe Railway Co.,* 387 U.S. 397, 407, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967). Thus, the fact that Continental was the consignee of the grain is no ground for condemning the Cal Harbor Shuttle operations on the record before the Court. Therefore, the Commission's treatment of the Cal Harbor Shuttle cannot be supported by the identity of the party contracting for rail service.

In the Commission's report and on this appeal, the argument has been advanced that the railroad's relinquishment of control over their equipment and crews violated the ICA. The Court must reject the Commission's contention that the relinquishment of control in isolation constitutes a violation of the act. Plainly, some degree of control by the shipper over the railroad's equipment is permissible. Any time a shipper orders cars and the railroad responds with service, a degree of control is relinquished. Thus, relinquishment of control alone is insufficient

to violate the ICA. Moreover, the only control referred to by the Commission is the designation by Continental of the return loading points. 357 I.C.C. at 872. Such designation is a necessary aspect of ordering rail service. Thus, mere designation of return loading points by consignees is insufficient to constitute a violation of the ICA. The Commission implicitly recognized this when it approved the operations of unit-trains under the rule-of-five in which shippers would continually designate the return loading points.

Traditionally, the ICA requires carriers to provide service upon reasonable request without discrimination. *See American Trucking Associations, Inc. v. Atchison, Topeka, & Santa Fe Railway Co.,* 387 U.S. 397, 406–07, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967). Of course, relinquishing control to a shipper would not insulate the carrier from traditional liability. However, mere relinquishment of control does not constitute a violation of the ICA. The Commission must demonstrate that the carrier in some manner failed to comply with the act's requirement that the carrier provide service to all who reasonably request it. In this case, the Commission has relied exclusively on its relinquishment-of-control rationale without demonstrating that the railroad in any way neglected its duties under the ICA. In the absence of such evidence, the Commission could not find that ICG and Continental violated the act. Accordingly, the Commission's conclusion is not supported by substantial evidence on the record.

■ The petitioners also persuasively contend that the Commission acted in an arbitrary and capricious manner in approving operations of unit-trains under the rule-of-five and condemning the Cal Harbor Shuttle. According to the petitioners, if the ICG violated the ICA by relinquishing control to Continental, unit-trains must also violate the act according to the same rationale. Unit-trains operating under the rule-of-five can be interrupted after the fifth trip if there is a car shortage. The Cal Harbor Shuttle could be interrupted at any

time for any reason. Thus, more control is relinquished in unit-train arrangements than there was under the Cal Harbor Shuttle's operations. Furthermore, the Commission ruled that the legality of unit-train operations would be judged on a case-by-case basis, 357 I.C.C. at 873; yet in the case of the Cal Harbor Shuttle, the Commission found that relinquishment of control on its face violated the ICA. 357 I.C.C. at 872. The Commission has failed to explicate a meaningful rationale for this different treatment. This failure alone would support reversing the Commission's conclusion. *See Atchison, Topeka & Santa Fe Railway Co. v. Board of Trade,* 412 U.S. 800, 805–06, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1972).

### III. THE COMMISSION'S CONCLUSION THAT THE CAR DISTRIBUTION ARRANGEMENT BETWEEN ICG AND CONTINENTAL VIOLATED THE ELKINS ACT IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD.

█ The Elkins Act, which provides criminal penalties for violations, is a broad and sweeping statute designed to "cut up by the roots every form of discrimination, favoritism, and inequality" in transportation. *United States v. P. Koenig Coal Co.,* 270 U.S. 512, 519, 46 S.Ct. 392, 394, 70 L.Ed. 709 (1926). Section 1(1) of the Act prohibits "any person . . . to . . . receive any rebate, concession, or discrimination in respect to the transportation of any property in interstate or foreign commerce by any common carrier . . . by any device whatever . . . ." 49 U.S.C. § 41(1). As a result, "favoritism which destroys equality between shippers, however brought about, is not tolerated." *Union Pacific R. R. v. United States,* 313 U.S. 450, 462, 61 S.Ct. 1064, 1071, 85 L.Ed. 1453 (1941).

█ The Commission contends that the discounting of grain on the basis of the consignee's undertaking the risk of transportation is an unlawful rebate within the prohibitions of the Act. 357 I.C.C. at 873–74. According to the Commission, the dif-

ference between the two bids offered by Continental to the rural grain elevator operators for their grain is a commercial advantage which is offset against published transportation charges. 357 I.C.C. at 873–74. Since the Commission's jurisdiction extends only to the lawfulness of conduct between railroad and shipper, the Commission's decision ostensibly does not challenge the prices paid for grain by Continental, but the arrangement by which Continental was able to exact such concessions. However, as with the alleged ICA violations, the Commission has focused on the Cal Harbor Shuttle arrangement, and the relinquishment-of-control rationale. For the same reasons discussed previously in this opinion, the Commission's finding that the Cal Harbor Shuttle violated the law must be set aside for a lack of substantial evidence on the record.

### IV. CONCLUSION.

The Commission's finding that the ICG and Continental violated the Interstate Commerce and Elkins Acts is not supported by substantial evidence on the record. The Cal Harbor Shuttle did not freeze the supply of rail cars in a manner conceptually different than the unit-trains operating under the Commission's rule-of-five. Accordingly, the Commission could not rely on conceptual distinctions such as "unlawful delegation," but was required to find that the petitioners acted in a discriminatory manner. In view of the foregoing, the portions of the Orders challenged herein are *reversed, vacated,* and *set aside as null and void.*