606 F.2d 442
 The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, the
Baltimore and Ohio Railroad Company, Boston & Maine
Corporation, Burlington Northern, Inc., the Chesapeake and
Ohio Railway Company, Chicago, Milwaukee, St. Paul and
Pacific Railroad Company, Chicago and North Western
Transportation Company, Consolidated Rail Corporation,
Delaware and Hudson Railway Company, the Denver and Rio
Grande Western Railroad Company, Detroit and Toledo Shore
Line Railroad Company, Detroit, Toledo and Ironton Railroad
Company, Elgin, Joliet and Eastern Railway Company, William
Gibbons, Trustee of Chicago, Rock Island and Pacific
Railroad Company, debtor, Grand Truck Western Railroad
Company, Green Bay and Western Railroad Company, Illinois
Central Gulf Railroad Company, Illinois Terminal Railroad
Company, the Kansas City Southern Railway Company,
Louisville and Nashville Railroad Company,
Missouri-Kansas-Texas Railroad Company, Missouri Pacific
Railroad Company, Norfolk and Western Railway Company,
Pittsburgh & Lake Erie Railroad, St. Louis-San Francisco
Railway Company, St. Louis Southwestern Railway Company,
Seaboard Coast Line Railroad Company, Soo Line Railroad
Company, Southern Pacific Transportation Company, Southern
Railway Company, Toledo, Peoria & Western Railroad Company,
Union Pacific Railroad Company, the Western Pacific Railroad
Company, Petitioners,
v.
The UNITED STATES of America and Interstate Commerce
Commission, Respondent.
 No. 77-2058.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 2, 1978.
Decided Oct. 2, 1979.
 
 James E. Sykes, Western Railroad Ass'n, Chicago, Ill. (T. S. Ellis, III, Hunton & Williams, James L. Howe, III, Southern Railway Co., Richmond, Va., John J. Paylor, Chessie System, Cleveland, Ohio, on brief), for petitioners.
 John J. McCarthy, Jr., I.C.C., Washington, D.C. (John H. Shenefield, Asst. Atty. Gen., Barry Grossman, Bruce E. Fein, Dept. of Justice, Mark L. Evans, Gen. Counsel, Frederick W. Read, III, Asst. Gen. Counsel, David Popowski, Atty., I.C.C., Washington, D.C., on brief), for respondent.
 
 
 1
 John K. Maser, III, Washington, D.C. (John F. Donelan, Frederic L. Wood, Donelan, Cleary, Wood & Maser, Washington, D.C., on brief), for intervenor, The National Industrial Traffic League.
 
 
 2
 Before BUTZNER and HALL, Circuit Judges, and HOFFMAN,* Senior District Judge.
 
 WALTER E. HOFFMAN, Senior District Judge:
 
 3
 By tariff provisions scheduled to become effective September 2, 1976, the railroads in the Eastern, Western and Southern territories of the United States[1] proposed to increase their separately stated transit charges on lumber and forest products. The proposed charges would be roughly uniform throughout the nation, the exception being certain areas which do not currently publish maximum charges per railroad car. Shippers of lumber and forest products filed protests with the Interstate Commerce Commission, objecting to the proposed tariff schedules. The Commission suspended the proposed tariff schedules on August 30, 1976, and by order of September 29 set the matter for hearing. Hearings commenced on November 9, and continued through November 12. Following the submission of briefs, the Commission issued a decision and order on March 22, 1977, which found that the schedules had not been shown to be just and reasonable, would result in undue preference and prejudice contrary to § 3(1) of the Interstate Commerce Act, 49 U.S.C. § 3(1) (1979 Supp.), 49 U.S.C. § 10741 (Revised Interstate Commerce Act)[2] and would constitute an unreasonable practice under § 1(6) of the Act, 49 U.S.C. § 1(6) (1979 Supp.), 49 U.S.C. § 10702 (Rev.Act). The proposed schedules were ordered cancelled, and on June 28 a petition for rehearing was denied.
 
 
 4
 "Transit" service is a privilege granted to a shipper whereby he is charged the regular line-haul rate from point A to point C, but is allowed to interrupt transportation at point B for purposes of storing, sorting, treating or processing. The shipper pays the difference between the through rate from point A to point C, less what has already been paid for shipment from point A to point B. Without this privilege, the shipper would be subject to paying local rates for going from A to B and then on to C. The railroads are allowed to collect a transit charge to recover the costs of providing this service. These costs include the additional expense incurred by switching, loading and unloading, clerical costs, cleaning of cars and police protection. Transit service is basically a switching operation involving full terminal service.
 
 
 5
 At the present time, according to findings by the Commission, approved transit charges recover only a portion of the actual expenses incurred by a railroad for providing this service. Calculated on a regional basis, railroads in the Eastern region recover only 42.6% Of variable transit costs per car; those in the Southern region recover 42.8%, and those in the Western region recover 57.5%. The proposed increases would allow the railroads in each region to recover 85.2%, 117.9%, and 91.9% Of variable costs per car, respectively. The specific proposal would raise the transit charges to 19 cents per hundredweight, with a minimum charge of $68.50 per car and a maximum charge of $143.94 per car. However, in any area which has an existing minimum or maximum charge per car which is higher than the proposed charge, the existing charge would remain in effect. Any area which has no existing maximum charge would not be subject to the proposed maximum.
 
 
 6
 The report of the Commission indicates that a majority of the panel members were greatly concerned about the uniform nature of the proposed charges. The report also indicates that a considerable number of shippers would be likely to switch to transportation by truck for all or part of their shipping requirements if the new charges were to go into effect. However, the concurring opinion of Commissioner O'Neal, and the dissenting opinion of Commissioner Stafford in the petition for rehearing, express the view that the proposed charges do not exceed a maximum reasonable level for any of the territories, and are clearly within the "zone of reasonableness." Rather than creating unjust discrimination or undue prejudice or preference, the proposed rates would in fact mitigate existing preferences.
 
 
 7
 We find great merit to the views of Commissioners O'Neal and Stafford. We are unpersuaded that the record before this court provides either substantial evidence or a rational basis to support the Commission's findings. It is therefore necessary for this court to vacate the order of the Commission and to remand to the Commission for its reconsideration in light of our views as expressed in this opinion.
 
 The Historical and Legislative Context
 
 8
 The nineteenth century began with the birth of the railroads and witnessed an incredible period of expansion as railroads reached into every corner of the nation. The historic race to span the continent culminated with the driving of a golden spike at Promontory Point, Utah, on May 10, 1869. This development of the railroad industry was encouraged by a government which provided rights of way, land grants and other benefits in order to hasten settlement of the West. See, Leo Sheep Co. v. United States, 440 U.S. 668, 99 S.Ct. 1403, 59 L.Ed.2d 677 (1979). The creation of the Interstate Commerce Commission was a response to the omnipotent position which the railroads had achieved over transportation in America by the latter part of the century.
 
 
 9
 The twentieth century witnessed the growth of alternate forms of transportation which now compete on an equal footing with the railroads the trucking and barge industries. The government invested heavily in highways and roads which enabled the trucking industry to provide shippers with a more convenient form of transportation. The government also provided large sums of money to construct, maintain and operate a system of waterways, thereby aiding the development of the barge industry. Thus railroads are no longer the dominant force which they once were in transportation. Depression, recession and inflation have all acted to place the railroads in a precarious financial position, epitomized by the bankruptcy of the Penn Central in 1970.
 
 
 10
 Among the legislative efforts to combat the decline of the industry was the Railroad Revitalization and Regulatory Reform Act of 1976, or 4-R Act,[3] Pub.L. 94-210; 90 Stat. 31 (Feb. 6, 1976). The stated purpose of the Act was to foster competition among railroads and other carriers, to permit railroads greater freedom to raise or lower rates in competitive markets, to formulate standards for determining adequate revenue levels for railroads, and to increase the attractiveness of investing in railroads. 45 U.S.C. § 801(b) (1979 Supp.). The legislative history of the Act emphasized the importance of enabling the railroads to recover the cost of doing business:
 
 
 11
 Railroad regulation has failed to assure adequate industry profits and rates of return and has retarded the industry's ability to compete with competitors. The Commission has, on the one hand, frequently used the power it possesses to hold down rates, often to protect the movement of commodities that would otherwise be isolated geographically. This "cross subsidization" policy has been an important part of public transportation policy since the beginning of Commission regulation. Nevertheless, changes in the economic strength of the railroads and their ability to cross subsidize seem to require some changes in that policy.
 
 
 12
 Less restrictive rate regulation is essential to the achievement of these goals. Railroads must be permitted to earn sufficient revenues to cover costs and to rebuild themselves so they can continue to provide services as private industries.
 
 
 13
 S.Rep. No. 94-499, pp. 10-11; 1976 U.S.Code Cong. & Admin.News, pp. 14, 24-25.
 
 
 14
 The 4-R Act is potentially sweeping in effect. However, at least one commentator has noted that there are difficulties inherent in the Act which could frustrate the overall purpose of the Act. See Krutter, The Railroad Revitalization and Regulatory Reform Act of 1976: Improving the Railroads Competitive Position, 14 Harv.L.J. 575 (1976). The system of detailed regulation by the Commission remains essentially intact. The Act instructs the Commission to consider "proof that such proposed changed rate . . . will have a significantly adverse effect . . . on the competitive posture of shippers or consignees affected thereby." 49 U.S.C. § 15(8)(f) (1979 Supp.); 49 U.S.C. § 10707(e) (Rev.Act). Any rate change is bound to have an adverse effect on some shippers relative to others, yet Congress clearly intended to do away with the system of cross subsidizing some shippers at the expense of the railroads. The Act preserves the right of the Commission to suspend a rate which is unreasonably discriminatory. 4-R Act, Pub.L. 94-210, § 202(f); 49 U.S.C. § 10711 (Rev.Act). Nevertheless, a rate must not be labeled discriminatory merely because competitive conditions naturally favor some shippers relative to others, in ways over which the railroads have no control. See, Transit Charge on Soybeans at Points in the South, 351 ICC 366, 378-79 (1975).
 
 
 15
 Transit Charges on Lumber and Forest Products
 
 
 16
 Using sources and customary methodologies which received the approval of the Commission, Transit Charges, Lumber and Forest Products, Nationwide, I & S Docket No. 9139 at page 13 (March 29, 1977), the railroads in each region computed the average variable costs per car and per hundredweight of forest products transited in their respective territories during selected base periods. Variable costs are the direct costs of labor, material, equipment, supervision, interest and the like incurred solely as a result of the services rendered. They do not include constant costs, which are expenses incurred on behalf of the operation as a whole, or items such as cost of capital or return on investment. See 49 U.S.C. § 1(5)(b) (1979 Supp.); 49 U.S.C. 10701 (Rev.Act). As the Commission explained in Transit Charge on Soybeans at Points in the South, 351 ICC at 377, a carrier cannot limit all its rates to variable costs without incurring operating deficits, eroding its capital and eventually reaching a point of financial extinction. To the extent that a carrier is required by the forces of competition to base some rates on variable costs, it must make up other costs by increasing the burden on other traffic.
 
 
 17
 The cost of furnishing transit service in the Eastern Territory, also known as Official Territory, is considerably higher than in the other territories. The average variable cost in the East is $152.30 per car and 22.7 cents per hundredweight. Current average revenues recover $64.84 per car, or 9.8 cents per hundredweight, which is equivalent to 42.6% Of costs per car and 43.2% Of costs per hundredweight. The proposed transit rates would recover 85.2% Of variable costs per car and 86.8% Per hundredweight. In the East are found most of the railroads which do not currently publish maximum transit charges per car. It is our understanding that the above figures reflect anticipated revenues without factoring in a maximum charge in those areas where it would be inapplicable. Thus, even though shippers of lumber and forest products in the East will not have the benefit of a maximum charge per car which most shippers in the other territories will enjoy, Eastern shippers will still be paying, on the average, less than 87% Of the variable costs of transit service.
 
 
 18
 In the Southern Territory the average variable cost of transit service is $105.19 per car and 15 cents per hundredweight. The existing charges generate $44.97 per car, and 6.4 cents per hundredweight, averaging a cost recovery of 42.8%. Revenues from the proposed charges would improve these ratios to an average of 117.9%. The Southern railroads also calculated costs and revenues on the basis of fully allocated costs. Fully allocated cost levels were found to be $119.51 per car and 17 cents per hundredweight. Present revenues recover only 37.6% Of fully allocated costs, but Southern carriers estimate that anticipated revenues would raise this figure to 103.8%. It is estimated that current out-of-pocket losses of more than $268,000 incurred in providing transit service for forest products would be converted to a gain of $84,056 annually. Transit charges which would recover less than 118% Of variable costs and less than 104% Of fully allocated costs would not appear to be unreasonable. Transit Charge on Soybeans at Points in the South, supra, 351 ICC at 378.
 
 
 19
 The Western railroads computed average variable costs to be $125.90 per car and 18.5 cents per hundredweight. Current revenues average $72.38 per car and 12 cents per hundredweight, providing a cost recovery of 57.5% And 64.86%, respectively. Revenues anticipated from the proposed charges would improve these ratios to 91.9% Per car and 103.24% Per hundredweight.
 
 
 20
 The evidence presented to the Commission indicated that many shippers in the South and some shippers in the West might be inclined to switch to motor transportation for shipping forest products. Shippers in these regions are generally located much closer to their sources of supply. With the increase in transit charges shippers might find it less costly to use trucks to transport raw materials to processing plants, and to use either rail or highway transportation to get the processed materials to their destinations. Shippers in the East are less likely to be able to take advantage of such an arrangement since they are usually farther from their sources and are less likely to have a short haul which would be convenient and less expensive to transport by truck.
 
 
 21
 In a nutshell, the proposed rates, on the average, would recover the out-of-pocket costs for providing transit service for forest products in the Western territory, would recover less than the actual cost of the service in the Eastern territory, and would recover in excess of the variable costs of providing the service in the South without exceeding significantly the fully allocated costs. The Commission has found that the proposed charges would result in undue preference and prejudice, and would constitute an unreasonable practice.[4] The question which must be asked is who would be unduly preferred by the proposed charges?
 
 
 22
 The protestants' evidence, as summarized in the report of the Commission, indicates that the most adverse effects of the proposed increase would fall on Eastern shippers, because these are the shippers who are farthest from their sources of raw materials. The Southern and Western shippers almost unanimously state that the increased charges will bring about a shift to highway transportation, thus mitigating the adverse effects that the proposed rates will have in these territories. Logically, the Commission's finding of undue preference and prejudice should lead one to the conclusion that Eastern shippers should be made to pay higher transit charges to cover out-of-pocket costs, and that charges for the Southern shippers should be lowered, so that they would be made to bear no more than their fair share of the burden. Such a policy would greatly enhance the natural competitive position of Southern shippers, and would no doubt cripple the East. We surmise that this is not the result desired by the Commission.
 
 
 23
 The Commission's report states that "Transit privileges, historically, have enabled transit operators located far from the sources of raw materials to compete effectively with operators located only a short truck-haul from these sources." Transit Charges, Lumber and Forest Products, Nationwide, supra, at page 6. The report goes on to speak of "the evil of uniformity" as "the advantage which would accrue to a competitor located close to the raw sources." This is exactly the kind of cross-subsidization policy which the Congress repudiated by its passage of the 4-R Act, Supra, page 4. Congress, in its wisdom, has decreed that it is in the best interests of national transportation policy that railroads be allowed to recover the costs of doing business, plus a reasonable and economic profit or return (or both) on capital employed in the business. 49 U.S.C. § 15a(4) (1979 Supp.); 49 U.S.C. § 10704(a)(2) (Rev.Act).
 
 
 24
 The Eastern territory is the favored region under the proposed transit charges. Even though the maximum charges per car will not be in effect in all areas in that territory, Eastern shippers will still be paying less than the cost of providing the service. The report of the Commission does not present a rational basis to support the determination that the proposed charges unduly discriminate against Eastern shippers. Likewise, the record does not support a determination that the charges would Unduly discriminate against shippers in the Southern territory. The record indicates that overall, if the new charges go into effect, these shippers will maintain or improve their competitive posture vis-a-vis the other territories. The slightly higher charges relative to cost recovery in the South are not unduly discriminatory, since they do not place those shippers at a competitive disadvantage and do no more than recover the fully allocated cost of providing the service. The language of the 4-R Act is clear, and the legislative history is compelling: railroads must be allowed flexibility in setting rates which are compensatory and which are adaptive to the conditions of the market in the transportation industry.
 
 
 25
 We are cognizant that review of a decision of the Commission involving rates is limited in scope. However, even with this limitation, a court reviewing a decision must be able to discern a rational basis for the Commission's conclusions. Potomac Electric Power Company v. United States,190 U.S.App.D.C. 77, 584 F.2d 1058, 1062 (D.C.Cir.1978).
 
 
 26
 The order of the Interstate Commerce Commission cancelling the proposed transit charges on lumber and forest products is vacated, and this case is remanded to the Commission for further proceedings not inconsistent with this opinion.
 
 
 27
 VACATED AND REMANDED.
 
 K. K. HALL, Circuit Judge, dissenting:
 
 28
 The majority chooses to reverse the ICC's determination that the proposed transit charges create undue preference and prejudice under § 3, and an unreasonable practice under § 1(6) of the Interstate Commerce Act. 49 U.S.C. §§ 1(6), 3(1); 49 U.S.C. §§ 10702, 10741 (Rev.Act). I cannot agree.
 
 
 29
 It is well established that the scope of judicial review in such cases is extremely narrow. See, e. g., Bowman Transportation, Inc. v. Arkansas Best Freight Systems, 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). Keeping in mind that the burden is upon the Railroad to establish the reasonableness of the proposed rates, I think that the Commission's determination in this case was rational. Amendments to a complex rate scheme are at issue. Applying its unique expertise, the Commission found the proposed nationwide transit charges to be discriminatory in several respects. They would impose "greatly varying burdens . . . on individual transit operators, ranging from insignificant increases to increases often in excess of 500 percent."[1] The uniform charges the hundredweight, and minimum and maximum carload rates fail to take into account regional disparities in cost of service. And the proposed minimum and maximum carload charges do not apply in some instances, creating yet another type of discrimination.[2]
 
 
 30
 The Commission analyzed these problems in the context of detailed testimony from protesting companies affected in various ways, and concluded that the railroads had not carried their burden of justifying the proposed charges. The fact that the majority would not have reached the same conclusion is not a proper ground for reversal; nor does the Railroad Revitalization and Regulatory Reform Act of 1976 (the 4-R Act) make it so. The legislative intent to allow railroads increased flexibility in establishing rates is manifest in the Act's new ratemaking provisions. But these provisions have no effect on the statutory prohibition against undue preference and prejudice. 4-R Act § 202(f); 409 U.S.C. § 10711 (Rev.Act).
 
 
 31
 The 4-R Act requires the Commission to "balance the needs of carriers, shippers and the public." 4-R Act § 101(a)(1); 45 U.S.C. § 801(b)(1). That is precisely what was done in this case. I see no reason to substitute this Court's judgment.
 
 
 32
 I would affirm.
 
 
 
 *
 Senior United States District Judge for the Eastern District of Virginia, sitting by designation
 
 
 [1]
 The three areas combine to make up the continental United States
 
 
 [2]
 The Interstate Commerce Act, as amended, was recodified by the enactment of Public Law 95-473, Oct. 17, 1978, 92 Stat. 1337. All citations will refer to the prior codification as it is found in the 1979 supplement to the United States Code Annotated, and to the parallel cite in the recodification which comprises Subtitle IV of Title 49, hereinafter cited as "Rev. Act."
 
 
 [3]
 The 4-R Act was not raised in two of the railroad's briefs before the Commission, and was only mentioned in passing in the remaining brief. Nevertheless, the Act was passed nine months prior to the issuance of the Commission's report. The strong congressional convictions expressed in the 4-R Act make this an appropriate case for following the general rule that law existing at the time of the appeal should be applied. Potomac Electric Power Company v. United States, 190 U.S.App.D.C. 77, 584 F.2d 1058, 1066-67 (D.C.Cir.1978). The tenets of the Act are therefore pertinent to these proceedings
 
 
 [4]
 The Commission made no finding that the proposed transit charges were beyond a maximum reasonable level. Under the 4-R Act the Commission may not suspend a rate increase as being in excess of a reasonable maximum unless it has found that a carrier has market dominance over the transportation to which the rate applies. 49 U.S.C. § 15(9) (1979 Supp.); 49 U.S.C. § 10709 (Rev.Act). This is in keeping with the Act's policy of letting rates be determined by the forces at work in a free market
 
 
 [1]
 In some cases these increases would accompany simultaneous reductions in line-haul rates, further disadvantaging those operators which must use transit services
 
 
 [2]
 Some operators would be unable to take advantage of the proposed maximum rates which place a ceiling on costs per car; others would have to pay a higher minimum carload charge than the proposed minimum, incurring a greater cost per hundredweight than others similarly situated